Rebecca JORDAN, etc., et al.

v.

**FIVE UNNAMED POLICE OFFICERS AND AGENTS, etc., et al.**

Civ. A. No. 80–1945.

United States District Court,
E. D. Louisiana.

Dec. 10, 1981.

---

Matthew B. Collins, Jr., New Orleans, La., for plaintiffs.

John W. Anthony, Bogalusa, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Plaintiff in this action is Rebecca Jordan, who seeks to proceed individually and on behalf of her minor children, Lisa Jordan, Boswell Jordan, Tanya Lynette and Sara Sherial Jordan. Mrs. Jordan is the mother of decedent, Charles Jordan, and, thus, has a clear right to proceed herein even though her right to proceed also in behalf of the minor children is in doubt. Such issue, however, is rendered moot by these findings.

2. Defendants in this action are Earl Glenn Penton, in his capacity as Chief of Police for the City of Bogalusa, Louisiana, and the City of Bogalusa. Mayor C. P. Verger appeared at trial as a representative of the City of Bogalusa.

3. On May 26, 1979, at approximately 6:55 p. m., the radio operator and dispatcher for the Bogalusa Police Department transmitted a call to the effect that a disturbance was in progress at or near 731 May Avenue in Bogalusa. Patrolman Mike Edwards signaled that he was responding to the call, and proceeded to the location. He was alone in his police car. Aware that Ptn. Edwards was alone in his car, Captain Reuben Sumrall and Sergeant (now Lieutenant) Wayne Kemp followed the department's standard procedure by also proceeding to that location in their respective patrol cars.

4. As Ptn. Edwards neared the designated address, the only person he saw was a black male, later identified as Charles Jordan, standing outside near the house and also near an automobile parked adjacent to the house. He was holding a shotgun by his side, muzzle down. As Ptn. Edwards drove closer to investigate, Jordan raised his shotgun and pointed it in Edwards' direction. At the same moment that Ptn. Edwards signaled for assistance on his radio, Jordan fired the shotgun, but did not hit Edwards. Ptn. Edwards, hunched down to hood height, drove his car in reverse a short distance back down the street. As that was taking place, Jordan fired a second shot but, again, did not hit Edwards.

5. Ptn. Edwards then got out of his car with his pistol drawn and called upon Jordan to put down the shotgun. Jordan tacitly refused by proceeding to reload his gun.

6. Ptn. Edwards' call for assistance, as well as the sound of the first shotgun shot, were heard by both Capt. Sumrall and Sgt. Kemp over their radios as they headed for the scene. As Sgt. Kemp turned onto May Avenue, he actually saw and heard Jordan fire the second shot. By this time, Captain (now Assistant Chief) Aubrey McMillan and his passenger, Auxiliary Policeman Robert DeWayne Ladner, had also arrived—in their patrol car—at the scene to assist Edwards, their arrival having also been precipitated by the radio exchanges above noted.

7. Each of the four assisting police officers got out of their patrol cars which had been pulled up on either side of and behind Edwards' patrol car. Mamie Tillman, who lived about one half block from where Jordan was standing (and who was called as a witness by the plaintiff), had come out of her house and saw Jordan holding his gun by his side. Before running back to her house, she had also heard Capt. McMillan, who was armed with a shotgun, instructing Jordan, at least two times, to put down his gun. Specifically, she recalled the words: "Put the gun down, son. Just put the gun down, son."

8. Instead, Jordan continued to reload his shotgun, and shouted words to the effect that the gun would have to be taken from him by someone who was willing to also take what was in it. Jordan then took a step backward and, thereupon, moved a step or two forward, raising his shotgun to a firing position aimed threateningly at the officers and specifically in the direction of Capt. McMillan.

9. In immediate response, Capt. McMillan fired his shotgun at Jordan. This firing was followed almost instantaneously by a rapid succession of gun shots: a single shot from Ptn. Edwards' pistol, two shots from Sgt. Kemp's pistol and two shots from Capt. Sumrall's pistol. Sgt. Kemp and Capt. Sumrall each fired their second shot immediately after their first shot and before Jordan was felled.

10. Jordan fell to the ground, still holding his shotgun. Ptn. Edwards came forward and removed the gun from Jordan's hand and unloaded two unfired shells. Capt. Sumrall called for an ambulance. Recognizing (correctly, in my view) that the severity of the wounds to Jordan's throat and chest precluded any sort of effective first aid treatment, and fearing a delay in ambulance response, the officers put Jordan on the back seat of Ptn. Edwards' car, and Jordan was driven by Edwards to Bogalusa's Charity Hospital. Sgt. Kemp followed directly behind him. Jordan was pronounced dead upon arrival or shortly thereafter at approximately 7:05 p. m.

11. Nathaniel Jackson, Cynthia Taylor, Joe King and Curtis McGee, who were in the neighborhood at the time of the shooting, essentially confirmed that a pattern of two shots, one soon after the other, followed by a longer pause and then a rapid succession of several shots had taken place.

12. Nathaniel Jackson further testified under direct examination that when he actually came upon the scene of these events after hearing the series of shots, he saw no gun in Jordan's hand. In light of Jackson's statements that "approximately two to three minutes" passed from the cessation of the shooting until he actually reached the scene, I conclude that Jackson saw no gun in Jordan's hand because the gun had already been removed by Ptn. Edwards.

13. Before taking Jordan to the hospital, Ptn. Edwards retrieved two spent shotgun shells from the ground near where Jordan had been standing. At the hospital, Capt. Sumrall and the attending physician removed a total of four additional unfired shotgun shells from Jordan's pockets. Capt. Sumrall also removed from one of Jordan's pants pockets an envelope with the following words written on it: "I'm going. Born to lose. Charles J. Jordan. I love everybody."

14. At the time of the incident, each of the regular officers at the scene had been working with the Bogalusa Police Department for a number of years: Ptn. Edwards, 5 years; Sgt. Kemp, approximately 7 years; Capt. McMillan, approximately 15 years; and Capt. Sumrall, 22 years. Auxiliary Policeman Ladner had been a volunteer auxiliary officer with the Bogalusa Police Department for approximately 8 years.

15. Ladner did not fire at all and was essentially uninvolved with the events hereinabove discussed except that he was at the scene, having arrived with Capt. McMillan and remained throughout.

16. Each of the four officers who fired at Jordan had undergone varying levels of active police training during his time with the force. This training included classroom and/or field experience with first aid, armed suspects, firearms and self-defense. Specifically, Ptn. Edwards, as a newly appointed Bogalusa police officer, attended the Louisiana State University Basic Law Enforcement Academy for six weeks in 1974. Sgt. Kemp attended the L.S.U. Basic Academy for six weeks in 1972, and the L.S.U. Advanced Law Enforcement Institute for three months in 1973. Capt. McMillan, in addition to his basic training and among other advanced training courses, attended a retrainer course at L.S.U. in 1967, the L.S.U. Law Enforcement Institute for three months in 1972, and the Civil Disturbance Orientation Course at Fort Gordon, Georgia, in 1974. Capt. Sumrall, in

addition to his basic training at L.S.U. in 1957 and other advanced courses, attended a retrainer course at L.S.U. in or around 1960, two weeks of F.B.I. firearms training in 1965, a three-month Juvenile Officers School at L.S.U. in 1974, and a two-day F.B.I. firearms training school in 1974. In addition to the training each officer received, all of the officers were familiar with the policy of the Bogalusa Police Department with respect to the use of deadly force. They understood and accepted the condition that deadly force was not to be used unless the threat of death or great bodily harm became manifest.

17. All five officers, including volunteer Auxiliary Policeman Ladner, had undergone first aid training as part of their basic training. In addition, Capt. McMillan, Sgt. Kemp and Ptn. Edwards had received first aid training in an advanced police course, the Navy and the Army, respectively.

18. Of the five officers who were at the scene, only Sgt. Kemp knew and recognized Jordan upon seeing him. Ptn. Edwards and Capt. Sumrall did not recognize Jordan, but had heard of him as having been previously arrested or as having a juvenile record. Capt. McMillan and Auxiliary Policeman Ladner neither recognized nor had heard of Jordan prior to this event.

### Conclusions of Law

1. This court has jurisdiction under 28 U.S.C. §§ 1331 & 1343.

2. Plaintiff seeks damages arising from the death of her son alleging that the Bogalusa Police Department and the City of Bogalusa violated her son's civil rights under 42 U.S.C. §§ 1981, 1983, 1985 and 1986 and under the United States Constitution by failing to properly train and supervise its police officers so as to avoid the use of deadly force against her son, and by conspiring to accomplish such a violation. As a pendent claim, plaintiff seeks relief from the wrongful death of her son under Article 2315 of the Louisiana Civil Code.

3. Defendants deny plaintiff's allegations and assert that the officers acted in defense of their own and others' lives, and that Charles Jordan's death was caused solely by his own wrongful and intentional acts. Defendants further assert that plaintiff's complaint fails to state a claim against defendants upon which relief can be granted on behalf of Rebecca Jordan's minor children who are alleged to be siblings of the deceased.

4. It is well settled that the Civil Rights statute upon which plaintiff bases her federal claim is not a general tort statute. Rather, it imposes liability only for deprivation of rights secured by the Constitution and laws of the United States, and not for violations of duties of care arising out of tort law. *Baker v. McCollan*, 443 U.S. 137, 138 & 146, 99 S.Ct. 2689, 2691 & 2695, 61 L.Ed.2d 433 (1979); *Shillingford v. Holmes*, 634 F.2d 263, 264 (5th Cir. 1981).

5. Whether the above described actions of the subject Bogalusa police officers crossed the so-called constitutional line that would cause the death of Charles Jordan to form a basis for an actionable claim under Section 1983 must be determined by the degree of force exerted in relationship to the need presented. *Roberts v. Marino*, 656 F.2d 1112, 1114 (5th Cir. 1981). *Shillingford v. Holmes*, 634 F.2d at 265.

6. The defense of qualified immunity, which is available to local, state and federal law enforcement officers, would protect the individual officers from liability for damages if they acted with a good faith belief based upon reasonable grounds that the measures they took were necessary. *Butz v. Economou*, 438 U.S. 478, 497–98, 98 S.Ct. 2894, 2906, 57 L.Ed.2d 895 (1978); *Maiorana v. MacDonald*, 596 F.2d 1072 (1st Cir. 1979). The individual officers, however, are not defendants in this action, having been previously dismissed on defendants' motion for summary judgment. Although the good faith qualified immunity defense of its officers is not available to a municipality in a § 1983 action, *Owen v. City of Independence, Mo.*, 445 U.S. 622, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673, *reh. denied*, 446 U.S. 993, 100 S.Ct. 2979, 64 L.Ed.2d 850 (1980), the actions of the individual officers

in this case are relevant to an ultimate determination of the adequacy of the law enforcement training provided by the Bogalusa Police Department and the City of Bogalusa.

■ 7. It is manifest that Charles Jordan provoked the confrontation which led to his fatal wounding. Jordan intentionally fired two shots in Ptn. Edwards' direction and, thereafter, refused to put down his reloaded shotgun despite repeated requests to do so. By raising his loaded shotgun to a firing position and aiming it at the officers who were standing within lethal range, Jordan forced the officers to protect themselves and others from death or great bodily harm.

8. The objects removed from Charles Jordan's clothing, including the four unfired shells and the note more particularly described above, indicate that Jordan's state of mind prior to the incident was one of intending to provoke a lethal confrontation.

9. Neither the number of officers who responded nor the number of shots fired by each officer forms a basis for concluding that there was overreaction or overzealousness on the part of the police department. The response of Capt. Sumrall and Sgt. Kemp in their respective cars, and the response of Capt. McMillan (accompanied by Auxiliary Policeman Ladner) accorded with a policy of the department to back-up an officer responding alone to a call, particularly when such officer comes under gunfire. The number of shots fired by each officer was commensurate with the existing need. Without a command to fire, each of the four officers who fired acted almost simultaneously as an immediate response to Jordan's threatening actions. Two officers fired a second shot only because Jordan had not fallen. The firing ceased immediately after Jordan was felled. Under the circumstances, the force employed by the officers was reasonable and necessary, and in accordance with the department's policy of not using deadly force except in life-endangering situations.

I must also reject the contention that the officers acted improperly by placing themselves in the open thereby creating the need to act in self-defense. Though their actions in this respect may not have been ideal by some hindsight application, it is reasonable to believe that their feeling that a physical show of force was the best measure under the rapidly developing circumstance of this unfortunate event.

■ 10. Further, I find no support for plaintiff's contention that the officers responded inadequately and improperly to Charles Jordan's dire need for medical treatment. The fact that Jordan was pronounced dead at the hospital within minutes after the shooting strongly indicates the severity of the wounds he received. When faced with Jordan's apparently fatal wounds to his neck and chest, the officers responded in the best way they could by transporting Jordan to the hospital themselves instead of waiting for an ambulance and risking further delay. Apparently, the administration of first aid methods would have been meaningless if not totally precluded by the nature and severity of the gunshot wounds. Thus, I conclude that the officers acted properly and that their failure to give Charles Jordan first aid treatment at the scene was neither imprudent nor improper.

■ 11. Because the evidence convinces me that the officers acted reasonably under the circumstances, both as to the use of deadly force and as to Jordan's need for immediate medical attention, I must reject plaintiff's contention that Charles Jordan's death resulted from inadequate or improper training on the part of the Bogalusa police force.

■ 12. The testimony advanced by the officers, the police chief and the mayor failed to reveal any pre-existing malice on the part of the police department or the city towards Charles Jordan. Moreover, no evidence was offered that the shooting of Charles Jordan was the product of any preconceived police plot or conspiracy.

■ 13. I conclude on the basis of the foregoing that the defendants did not mis-

use their authority so as "to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights." *Shillingford v. Holmes*, supra, 634 F.2d at 266 (5th Cir. 1981). Therefore, plaintiff's federal cause of action must fail.

14. Turning to plaintiff's pendent state claim, I exercise my discretion to leave that claim for determination by the appropriate state forum. Nonetheless, I think it appropriate to indicate my opinion that the facts do not support plaintiff's allegations that defendants were negligent either directly or under the doctrine of respondeat superior.

Counsel for defendants is directed to prepare and submit a judgment that is consistent with these findings and conclusions.