**Lawrence SCHILLER, Plaintiff,**

v.

**John STRANGIS and Joseph Picchione, Defendants.**

**Civ. A. No. 77–3116–K.**

United States District Court, D. Massachusetts.

June 4, 1982.

Bramberg, Hamada, Barker & Frieden, James A. Frieden, Boston, Mass., for plaintiff.

Kenneth J. Elias, Brockton, Mass., for defendants.

## OPINION

KEETON, District Judge.

This is an action for compensatory and punitive damages by plaintiff Lawrence Schiller, a resident of Brockton, Massachusetts, against defendants John Strangis and Joseph Picchione, police officers for the City of Brockton. Plaintiff alleges violations of the Fourth and Fourteenth Amendments of the U.S. Constitution, actionable under 42 U.S.C. § 1983, and violations of Articles Twelve and Fourteen of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts, actionable in tort as pendent state law claims. In addition plaintiff asserts common law claims for trespass, assault, battery, and false imprisonment. The case was tried before the court without a jury on March 15–17, 1982.

### I.

The evidence before me is sharply in conflict with respect to many details of the incidents of September 25–26, 1976, described below. From a preponderance of the evidence I find as follows:

On Saturday afternoon, September 25, 1976 Lawrence Schiller, accompanied by his brother, drove to the Brockton Public Market ("BPM") to purchase a 50-pound bag of dog food. Schiller drove into the shopping center, parked at the front entrance of the BPM, and remained in the car with the engine idling while his brother went into the store to make the purchase. An employee of the BPM, having noticed that Schiller's vehicle was blocking the entrance ramp to the store, asked Schiller to move his car. Schiller refused and after a brief exchange of words the employee left to get assistance from a police officer. Inside the store the employee found John Strangis, a policeman with the City of Brockton who during his off-duty hours was working that afternoon as a security guard for the BPM. Strangis and the employee stepped outside the front doors of the store. Standing approximately fifteen feet from the vehicle Strangis whistled to get Schiller's attention and by hand signal directed him to move

the car. Schiller responded with obscene words and an obscene gesture. Strangis immediately moved closer to the car and Schiller responded by driving away rapidly and in a manner that endangered the safety of pedestrians and other vehicles in the parking lot. Strangis attempted to pursue the vehicle on foot but was unsuccessful.

After losing sight of the vehicle Strangis returned to the BPM and telephoned the local police station. Strangis reported the registration plate number of the automobile and asked the police to obtain from the Registry some of the information he needed to issue a traffic citation. The information an officer needs to issue a citation includes the vehicle registration number, the name and address of the owner of the vehicle, the name and address of the driver, and the driver's license number and date of birth. Strangis was told that the Registry had answered the police request with "no response" and, therefore, that the information was unavailable at that time. As an officer with approximately ten years experience on the Brockton police force, Strangis understood that "no response" to this type of inquiry can mean, among other things, that the vehicle has been registered recently or that the Registry's computer is malfunctioning. Strangis made further inquiry at the BPM, and learned from an employee that the driver of the vehicle was known as either Lawrence Katz or Lawrence Schiller, that this individual had changed his name at some time, and that he lived on either Lookoff Street or Moncrief Road in Brockton.

The incident at the shopping center occurred at approximately 4:30 p.m. Strangis continued working at the BPM until 10:30 p.m. and reported for his regular tour of duty with the Brockton police at midnight. Strangis and his partner Joseph Picchione, an officer with approximately eight years of experience at that time, were assigned to cruiser patrol in the southwest district of the City. Strangis told Picchione about the incident at the BPM and the partners agreed that they would attempt to investigate further that evening for the

purpose of issuing a traffic citation. If not transgressing limits that had not been clearly defined by the Brockton Police Department, an investigation during duty hours of an offense (including a traffic misdemeanor) observed in off-duty hours would be consistent with an announced Department policy of permitting overtime only in the most exceptional circumstances.

At approximately 1:00 a. m. Strangis and Picchione obtained authorization from police headquarters to leave their assigned territory and to travel in the police cruiser to Lookoff Street and Moncrief Road to investigate. Twice that evening the officers drove to these streets but were unable to find the automobile that had been involved in the incident at the BPM. The officers returned to these addresses a third time and spotted the vehicle in a driveway at 166 Moncrief Road. The policemen pulled the cruiser to the side of the road and approached the house. Both officers could see the light from a television set through a window of the house. With Picchione standing a few feet behind, Strangis walked to the front door and knocked.

It was approximately 3:30 a. m. when Schiller heard the knock at the door. Schiller, who was 21 years old at the time, had been to a movie and a bar that evening with a friend and had returned to the house at 166 Moncrief Road at approximately 3:00 a. m. When the officers knocked, Schiller was watching television, having not yet retired for the evening. He was fully clothed but without shoes.

Upon hearing the knock Schiller went to the door and asked for identification. Strangis responded, "Brockton police." Schiller opened the door. Strangis asked plaintiff if he was Lawrence Schiller or Lawrence Katz and plaintiff replied that his name was Lawrence Schiller. Strangis pressed closer, intentionally placing one foot on the threshold of the doorway so that Schiller would be unable to close the door. "I'm here for that stunt you pulled at the BPM," Strangis announced, and demanded to see Schiller's license and registration. Schiller asked whether the officer had a

warrant and Strangis replied that he was there to issue a traffic citation only, not to make an arrest. Schiller stated that the registration was in his car, that he would need to put his shoes on to go outside, and that he did not want the policemen in his house. Schiller then attempted to separate himself from the officers by closing the door. Strangis, with his foot placed firmly on the threshold, prevented the door from closing. The two briefly exchanged words and as Schiller again tried to close the door Strangis reached inside the house and grabbed Schiller. After a short struggle in the doorway, Strangis subdued Schiller with a tight headlock and dragged the smaller Schiller onto the porch where Picchione secured Schiller's hands behind his back and applied handcuffs. The officers then escorted Schiller briskly from the porch to the street and placed him in the back seat of the cruiser. Strangis, holding his flashlight, demanded to see Schiller's license and registration. Schiller refused, stating that he did not wish to talk to Strangis. Seeing what appeared to be a wallet in plaintiff's back pocket, Strangis pushed Schiller to the side and reached for the pocket. Schiller, with his hands in cuffs behind his back, resisted by stiffening his body and bracing against the back of the seat. Strangis struck Schiller several times on the back of his head and neck with the flashlight. Strangis seized the wallet firmly and pulled it with force. As he pulled at the wallet Schiller's pants pocket, which was sewed onto the outside of the pants, ripped off, and the wallet dropped onto the seat. Strangis seized the wallet, intentionally opened it, and removed the license. Having obtained the desired information, Strangis returned the wallet and license to Schiller and repeated his original demand for the registration. Schiller refused to talk, and Strangis threatened him with the flashlight. Without the consent of Schiller, Strangis then walked to the car in the driveway, opened the door, which was unlocked, reached into the glove compartment, and removed the registration. Strangis copied the desired information, placed the registration back into the glove compartment,

closed the car door, and returned to the cruiser. As the officers prepared to leave, Schiller told Picchione that the door to the house was wide open. Plaintiff stated that he wanted the door locked but that he did not want the officers to enter his house. Strangis walked to the front door, went inside the house, and discovered the keys hanging from the inside lock of the door. Strangis removed the keys, stepped outside, locked the door, and returned to the cruiser.

The officers returned to the Brockton police station and escorted Schiller to the booking room. The handcuffs were removed and Schiller was told to place his belongings on the booking desk. Schiller removed several coins from his pocket and tossed them at the booking desk. One or more of the coins fell to the floor. At some point during the booking procedures Schiller was advised of his rights, including his right to a phone call. When Schiller asked for money to make a phone call, Strangis informed him that there was a coin on the floor and that he should pick it up. Schiller accused Strangis of having knocked the coin off the desk and told Strangis that he should pick it up. Strangis again ordered Schiller to pick up the coin and when he refused, Strangis attempted to push Schiller to the floor. Schiller resisted and Strangis pushed him against the wall. Picchione intervened to restrain Strangis who then left the room. The booking procedures were completed and Schiller was placed in a jail cell. A short time later Strangis appeared outside Schiller's cell and delivered a traffic citation.

## II.

Plaintiff was released from the Brockton jail on Sunday morning, September 26, having been charged with operating a vehicle to endanger, refusing to produce a license and registration to a police officer, disturbing the peace, and assault and battery on a police officer. Shortly after his release, plaintiff went to the emergency room of Brockton Hospital for an examination. The treating physician reported in his assessment of the injuries that plaintiff had been "beaten on head and neck" and that plaintiff had sustained "superficial bruises on neck, upper back & chest." Pl. Exhibit 5. The physician also reported "head & neck contusions—no serious injury." *Id.* X-rays of the skull and cervical spine, which were taken at the hospital, revealed no abnormalities. *Id.*

I find that the hospital report accurately describes the physical injuries to which it refers. In addition, I find that plaintiff sustained minor ankle bruises and a bruised lip, from which some bleeding occurred, during the scuffle at his home with Officer Strangis. Consequences of these injuries, which were not mentioned in the hospital report, and were not serious, are revealed in photographs taken of plaintiff approximately ten days after the incident. *See* Pl. Exhibits 8A–8D.

In addition to these physical injuries I find that as a result of the force used against him, plaintiff experienced minor disruptions of his eating, sleeping, and dreaming patterns, and suffered emotional stress in his relationships with friends and family in the weeks immediately following the arrest.

Plaintiff proved that $2923.42 was paid in legal fees for his defense in the state criminal proceedings. These fees were paid by Eva-Maria Schiller on behalf of her son Lawrence. The evidence before me does not disclose explicitly what portions of these fees are attributable to separate criminal charges.

## III.

To establish a claim under 42 U.S.C. § 1983 plaintiff must prove that he was deprived of "rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State."

In the Amended Complaint plaintiff alleges that he was deprived of "due process of law and other rights, privileges and immunities secured to United States' citizens by the Constitution of the United States." Amended Complaint at ¶ 23. These general

allegations are supplemented by additional filings with the court in which plaintiff identifies four specific constitutional violations: (1) an unlawful arrest in violation of the Fourth and Fourteenth Amendments; (2) an unlawful search of plaintiff's home, automobile, and person in violation of the Fourth and Fourteenth Amendments; (3) a deprivation of liberty without due process of law by a false imprisonment; and (4) a deprivation of liberty without due process of law by the use of excessive force. *See* Plaintiff's Trial Memorandum at 2; Plaintiff's Pretrial Memorandum at ¶ 7.

There is no question that during the events of September 26, 1976 Strangis and Picchione were clothed with statutory authority as police officers for the City of Brockton, and, therefore, that defendants were acting under color of state law. In dispute is whether Schiller was deprived of any "rights, privileges, or immunities secured by the Constitution," and if such a deprivation did occur, whether defendants acted in good faith and are immune from liability.

A. Violations of Fourth and Fourteenth Amendments

■ As factfinder I have determined from a preponderance of the evidence that Schiller did not attack Strangis while the officer was standing at the doorway of plaintiff's home in the early morning hours of September 26, 1976. Schiller merely attempted to close the door to his house, which was an act of reasonable force to prevent an unprivileged intrusion. It was Strangis who initiated the encounter, first, by intentionally placing his foot on the threshold of the doorway to prevent Schiller from closing the door, and second, by reaching into the home and grabbing Schiller to make the arrest. Schiller took no action preceding the physical contact initiated by Strangis that could reasonably be construed as an assault on the police officer. Having

resolved the factual dispute in this manner, I conclude that the arrest was without probable cause,[1] and, therefore, in violation of both state and federal law. *See United States v. McQueeney*, 674 F.2d 109, 114 (1st Cir. 1982); *Julian v. Randazzo*, 380 Mass. 391, 403 N.E.2d 931, 933–34 (1980).

■ After plaintiff was subdued and placed in the patrol car Strangis seized Schiller's wallet and removed the driver's license, searched the glove compartment of Schiller's automobile and removed the registration, and intentionally entered Schiller's home. At no time did Schiller consent to these warrantless searches. Before the confrontation at the doorway occurred, Officer Strangis had no authority under state law to conduct these searches. He did not obtain such authority by making an unlawful arrest. These warrantless searches, and the warrantless intrusion into Schiller's home, all of which occurred at the time of the unlawful arrest and were unrelated to any legitimate security interests that might have arisen from the circumstances of the arrest, were illegal under both state and federal law. *See United States v. Irizarry*, 673 F.2d 554, 557–60 (1st Cir. 1982), and cases cited therein.

■ With some misgivings about the consistency of the precedents on which I rely with precedents regarding due process analysis,[2] I conclude that the warrantless searches and the warrantless arrest, occurring without probable cause and in violation of both state and federal law, were also actionable under 42 U.S.C. § 1983, as violations of the Fourth and Fourteenth Amendments. Without doubt,

> the guarantee against unreasonable searches and seizures contained in the Fourth Amendment has been made applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. *Wolf v. Colorado*, 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782]; *Elkins v. Unit-*

---

1. Defendants contend that they arrested Schiller because of the alleged assault on Strangis. They do not contend that Schiller's alleged illegal conduct in the BPM parking lot the previ- ous afternoon justified arrest without a warrant.

2. *See* part III–B *infra*.

ed States, 364 U.S. 206, 213 [80 S.Ct. 1437, 1441, 4 L.Ed.2d 1669].

Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961). Also, in light of Monroe v. Pape, it is clear that unreasonable searches and seizures by state officers acting under color of but in violation of state law may be actionable under 42 U.S.C. § 1983. Although most of the cases so stating have involved circumstances in some respect more egregious than the minimum essential to concluding that the search or seizure was effected by a state officer, acting under color of state law, and without probable cause, the rationale of these Fourth and Fourteenth Amendment cases appears not to require anything more than that minimum to establish a cause of action under Section 1983 as supplementary to remedies available under state law. See, e.g., Duriso v. K-Mart No. 4195, Div. of S. S. Kresge Co., 559 F.2d 1274 (5th Cir. 1977); Pritchard v. Perry, 508 F.2d 423 (4th Cir. 1975). I therefore conclude that plaintiff in this case is entitled to recover under Section 1983 for the warrantless searches and warrantless arrest.

■ What is the proper measure of damages under this theory of recovery? A court is to be guided in a Section 1983 action by the analogy to rules of compensation in tort law. Carey v. Piphus, 435 U.S. 247, 253–59, 98 S.Ct. 1042, 1046–50, 55 L.Ed.2d 252 (1978). The "task of adaptation [of tort rules to this context is] one of some delicacy," id. at 258, 98 S.Ct. at 1049, and in the present instance there is no guiding precedent directly in point. The Court has observed, however, that statutory provisions for a federal remedy for civil rights violations

> should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.

Monroe v. Pape, 365 U.S. at 187, 81 S.Ct. at 484. Among the natural and indeed intended consequences of the warrantless searches and warrantless arrest in this case are the impacts upon the plaintiff of the excessive force used in effecting the searches and arrest. See part III–E infra. I conclude that it is consistent with traditional tort principles and an appropriate adaptation of those principles to this context to include as elements of damages not only reasonable compensation for the warrantless searches and warrantless arrest but also reasonable compensation for physical and emotional harm caused by the excessive force used in effecting the unlawful searches and the unlawful arrest, and in effecting the detention that followed directly from the arrest. Thus, liability under Section 1983 having been established, I conclude that, subject to an appropriate provision in the judgment against double recovery, all these elements of recovery that are available under the pendent state law causes of action are also within the measure of recovery under Section 1983. This conclusion regarding the scope of liability under Section 1983 may be essential to disposition of this case because of its potential bearing upon awards of punitive damages and attorney's fees.

Detailed findings and conclusions applying the measure of damages to the evidence in this case are stated in parts III–D & E infra.

### B. Deprivation of Liberty Without Due Process of Law

Recognizing that the grounds of decision stated in part III–A immediately above rest, first, on an interpretation of precedents as to which differences of opinion might reasonably exist, and, second, a reliance on analogy rather than direct precedent with respect to the measure of damages, I proceed to consider whether alternative grounds independently support the judgment required by the conclusions stated in part A supra.

Has plaintiff also established the third and fourth of his four alleged constitutional violations [3]—that is, (3) a deprivation of liberty without due process of law by a false imprisonment and (4) a deprivation of liberty without due process of law by the use of excessive force?

---

**3.** See part III, ¶ 2 supra.

■ During the illegal arrest, plaintiff's physical integrity was violated, first, at the moment of seizure when he was grabbed by Officer Strangis and taken to the patrol car, second, when he was threatened and struck by Officer Strangis with a flashlight while plaintiff was handcuffed and seated in the cruiser, and finally, when he was pushed against a wall by Officer Strangis during the booking procedures at the Brockton police station. Strangis was without privilege under state law to commit these acts of force since the arrest itself was unlawful, and since Strangis used more force than he reasonably could have believed necessary to effect the arrest or accomplish lawful objectives incident to the arrest. *See Julian*, 380 Mass. at ——, 403 N.E.2d at 934 & n.1.

■ There is no doubt that, "in appropriate circumstances, the use of excessive force or violence by law enforcement personnel violates the victim's constitutional rights." *Landrigan v. City of Warwick*, 628 F.2d 736, 741–42 (1st Cir. 1980) (physical attack at time of arrest). *See also Collum v. Butler*, 421 F.2d 1257, 1259 (7th Cir. 1970) (physical attack while in lawful confinement after arrest). So too, in appropriate circumstances an unlawful detention or confinement may violate an individual's constitutional rights. *See Reeves v. City of Jackson*, 608 F.2d 644, 650 (5th Cir. 1979). The question remains, however, did the detention and the use of force in this case, both of which were unlawful under state law, amount to violations of plaintiff's constitutional rights actionable under 42 U.S.C. § 1983? A difficulty in deciding this issue arises from the lack of clarity in precedents concerning what standard courts should use in evaluating these types of Fourteenth Amendment claims. It may be argued that not every violation of an individual's bodily security and freedom (even though under color of state law) is a violation of the Fourteenth Amendment, since that Amendment prohibits only "deprivation" of "liberty" under color of state law and "without due process of law." *Cf. Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (false imprisonment under state law not a violation of the Fourteenth Amendment); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (defamation under state law not a violation of the Fourteenth Amendment). Do these concepts imply some minimum standard of severity of the violation of bodily security and freedom as a prerequisite to the conclusion that a violation of the Fourteenth Amendment has occurred? It may also be argued that even if a plaintiff does not have to satisfy a minimum standard of severity to establish a Fourteenth Amendment violation, not every violation of the Fourteenth Amendment is actionable under 42 U.S.C. § 1983. Must a plaintiff, in addition to proving a violation of an interest that is protected by the Fourteenth Amendment, prove something more to establish a claim, that, as the question has been informally phrased in argument, "rises to the level of constitutional tort," actionable under 42 U.S.C. § 1983? If so, how is that "something more" to be described?

Unclear from the precedents is the method of analysis or the appropriate standard to be applied in determining whether, on particular facts proved, a claimant's "due process" rights or a claimant's right to "liberty" have been violated. One reason for the lack of clarity arises from the fact that a Fifth or Fourteenth Amendment "due process" claim can take either of two forms —"procedural due process" or "substantive due process." *See generally Hall v. Tawney*, 621 F.2d 607, 610–13 (4th Cir. 1980). Under "procedural due process," the claimant is alleging that the state has unlawfully interfered with a protected liberty or property interest by failing to provide adequate procedural safeguards. The claim is that the *procedures* used by the state in effecting the deprivation of property or liberty were inadequate in light of the significance of the affected interest. The constitutional violation is established by proving a "property" or "liberty" interest, proving a "deprivation" of that interest "without due process of law," and proving that the deprivation occurred "under color of state law." *See, e.g., Parratt v. Taylor*, 451 U.S. 527,

536–37, 101 S.Ct. 1908, 1913–14, 68 L.Ed.2d 420 (1981); *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). Distinguishable from "procedural due process" claims, are those claims that have been analyzed under the rubric of "substantive due process." "Substantive due process" cases have held that although no specific provision of the Bill of Rights has been violated, the state's conduct was such as to "shock the conscience" of the court and, therefore, to violate the due process clause. *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). *See Hall v. Tawney*, 621 F.2d at 607 (corporal punishment in public school); *Johnson v. Glick*, 481 F.2d 1028, 1032–33 (2d Cir.) (unprovoked attack by jail guard on pre-trial detainee), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973). A "substantive due process" claim is, fundamentally, not a claim of procedural deficiency, but, rather, a claim that the state's conduct is inherently impermissible. In *Rochin*, a case in which incriminating evidence was held inadmissible because police officers had obtained the evidence by subjecting the suspect against his will to a stomach pump, the Court explained the underlying theory of substantive due process:

> Regard for the requirements of the Due Process Clause "inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Malinski v. New York, supra*, [324 U.S. 401] at 416–417 [65 S.Ct. 781 at 788–789, 89 L.Ed. 1029]. These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "so rooted in the traditions and conscience of our people as to be ranked as fundamental,"

*Snyder v. Massachusetts*, 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed. 674], or are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288].

*Rochin*, 342 U.S. at 169, 72 S.Ct. at 208. Because the line dividing "procedural due process" from "substantive due process" is not always bright, it may be difficult in some cases to determine which is the proper characterization of the plaintiff's claim. *Compare Baker v. McCollan*, 443 U.S. 138–47 & n.5, 99 S.Ct. 2691, 2696 & n.5 (majority opinion) *with id.* at 147–49, 99 S.Ct. at 2696–97 (concurring opinion) *and id.* 149–56, 99 S.Ct. 2697–2700 (dissenting opinion). Moreover, it will surely occur to advocates to argue three alternatives on the facts proved in a particular case—first, that "procedural due process" is the proper characterization, second, that "substantive due process" is the proper characterization, and, third, that the claim is properly characterized as both procedural and substantive and therefore that plaintiff should prevail if the proof satisfies the standards established by precedents for either type of claim. Is this third alternative valid for a claim that state officers used excessive force in effecting an unprivileged, warrantless arrest and search? If plaintiff's claims of false imprisonment and use of excessive force are properly characterized as "procedural due process" claims (because they were warrantless), the appropriate disposition of the claims is problematic. The traditional "procedural due process" analysis involves three elements, two of which are clearly satisfied. First, defendants acted under color of state law. Second, the right to be free from corporal punishment, and the right to be free from physical confinement are protected "liberty" interests encompassed by the Fourteenth Amendment. *See Ingraham v. Wright*, 430 U.S. at 673–74, 97 S.Ct. at 1413–14 (corporal punishment); *Baker v. McCollan*, 443 U.S. 137, 143–46, 99 S.Ct. 2689, 2694–95, 61 L.Ed.2d 433 (1979) (false imprisonment under facially valid arrest warrant—existence of liberty interest implicit). The third element, however, is pro-

blematic. Was the failure of the officers to act in conformity with state law enforcement practices a "deprivation" of liberty *"without due process of law"* for which the availability of a post-deprivation tort law remedy is inadequate to satisfy the minimum requirements of the Fourteenth Amendment? Precedents do not supply a clear answer. The Supreme Court has held that the use of unreasonable force by a public school teacher against a student does not constitute a deprivation of liberty "without due process of law" where the state has provided the student with a post-deprivation tort remedy. *Ingraham v. Wright*, 430 U.S. at 673–83, 97 S.Ct. at 1413–19 (noting the state's long-recognized interest in permitting the use of corporal punishment in public schools as a means for maintaining discipline). *Cf. Parratt v. Taylor*, 451 U.S. at 543–44, 101 S.Ct. at 1916–17 (negligently caused deprivation of property not without due process of law where post-deprivation remedy available). The Ninth Circuit, relying on *Parratt v. Taylor*, applied this same rationale and held that the availability of a state law cause of action for assault and battery was sufficient to satisfy the "due process of law" requirement of the Fourteenth Amendment. *Rutledge v. Arizona Bd. of Regents*, 9 Cir., 660 F.2d 1345, 1352 (1981) (unprovoked attack by state university football coach against student-athlete). None of these cases, however, involves an intentional deprivation of liberty by law enforcement personnel as occurred here. It is even more problematic whether the availability of a cause of action for assault, battery, and false imprisonment is adequate to protect individuals from the occurrence of this type of intentional lawlessness by the police where, as in this case, the state's tort law does not permit punitive

damages. If, despite the uncertainty in precedents, plaintiff's claims are treated as "procedural due process" claims and it is held that the third element is satisfied, then in the absence of evidence supporting a good faith defense of immunity, plaintiff would be entitled to damages under 42 U.S.C. § 1983.

One might argue, with apparent support in some precedents, that the use of excessive force is itself a Fourth and Fourteenth Amendment violation, which, without proof of anything more, establishes a cause of action under precedents discussed in part III–A *supra*. *See, e.g., Jenkins v. Averett*, 424 F.2d 1228, 1231–32 (4th Cir. 1970) (Fourth Amendment right of people to be secure in their "persons" is a shield covering the individual's physical integrity and supports an action under 42 U.S.C. § 1983 for reckless and wanton use of excessive force by police), *cited with approval in Landrigan*, 628 F.2d at 742. It is not clear whether the theory of *Jenkins* is properly to be characterized as an instance of "procedural due process" analysis, or as an instance of "substantive due process" analysis (in which case it stands in sharp contrast with other precedents to be discussed, *infra*), or is a third form of due process analysis that fits neither the "procedural due process" nor the "substantive due process" framework derived from *Rochin*.[4]

■ In any event, in whatever way *Jenkins* may be interpreted, plaintiff's claims based on false imprisonment and excessive force are problematic also if it is held that they must be analyzed as "substantive due process" claims. Of course, plaintiff may contend that defendants' conduct was a flagrant abuse of official power that is contrary to the "concept of ordered

---

**4.** One might reasonably argue that the stringent "something more" standard of "substantive due process" claims discussed in the text at pp. 615–616 *infra*, does not apply to a claim of violation of any right explicitly guaranteed in the Fourth Amendment—including the right not to be subjected to an unreasonable search or seizure. The Court has stated:

There are other interests, of course, protected not by virtue of their recognition by the law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights which has been "incorporated" into the Fourteenth Amendment. Section 1983 makes a deprivation of such rights actionable independently of state law. See *Monroe v. Pape*, 365 U.S. 167 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961).

*Paul v. Davis*, 424 U.S. 693, 710–11 n.5, 96 S.Ct. 1155, 1164–65 n.5, 47 L.Ed.2d 405 (1976).

liberty," and thus in violation of substantive due process rights. As to such a contention, it is well established that not every tort under state law becomes a federally cognizable constitutional tort simply because it is committed by a state official under color of state law. *See Baker v. McCollan*, 443 U.S. at 146, 99 S.Ct. at 2695; *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). *See also Paul v. Davis*, 424 U.S. at 701, 96 S.Ct. at 1160 (construing the meaning of "liberty" in a procedural due process claim). To establish such a substantive due process claim, the plaintiff must show that the conduct "shocks the conscience." Recognizing that such a vague and discretionary standard cannot be defined with precision, and that such a standard cannot mean the same thing for all people in all circumstances, some courts have attempted to identify the relevant factors to be considered by the factfinder. *See Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981); *Hall v. Tawney*, 621 F.2d at 613; *Johnson v. Glick*, 481 F.2d at 1033. As Judge Friendly explained in *Johnson v. Glick* :

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to

maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Id. See also Furtado v. Bishop*, 604 F.2d 80, 95–96 (1st Cir.), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980) (claim of cruel and unusual punishment by prison officials in which trial court used *Johnson* formulation during jury instructions rather than requiring a finding that force used was "shocking or violative of universal standards of decency"; instruction to jury held to be not plain error). Even this formulation, however, does not cure the inherent ambiguity in the standard of substantive due process. For example, the *Johnson* formulation does not instruct the factfinder as to how much weight should be given to each factor. Nor does this formulation indicate whether any single factor is either necessary or sufficient to establish the claim. As with other types of evaluative determinations, the question whether "the constitutional line has been crossed" under the *Johnson* formulation is left ultimately to the discretion of the factfinder, limited only by the bounds of reasonableness and precedent. This is not to say that such a standard lacks guiding quality. It is to say, however, that the whole inquiry is collapsed into one evaluative weighing of factors,[5] the purpose of which is that the factfinder speak as the conscience of the community.

If required to decide any aspect of this case on substantive due process grounds and required, before determining that such an aspect of plaintiff's claims has

---

**5.** Judge Friendly's formulation of the single inquiry in *Johnson* is quoted at p. 616 *supra*. Use of the *Johnson* formulation in a jury charge occurred at trial in *Furtado v. Bishop*, 604 F.2d 80 (1st Cir.), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). This formulation incorporates into the single inquiry not only what might be viewed, under a different formulation, as the elements of a prima facie case for a constitutional tort but also the qualified immunity dependent on good faith. Such a single inquiry requires an evaluative determination of a mixed question of fact and law in which discretionary judgment is exercised. Ordinarily such determinations are made by the factfinder, whether judge or jury, as questions of fact are decided. *E.g., O'Neill*

*v. Dell Publishing Co.*, 630 F.2d 685 (1st Cir. 1980) (application of standard of "substantial similarity" in action for copyright infringement, on motion for summary judgment); *Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106 (1st Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980) (application of clearly erroneous standard to district court finding of sex discrimination). In most cases, therefore, the single-inquiry formulation requires a different method of analysis in a nonjury trial, and a different method of submission in a jury trial, from the methods required if each element of a prima facie case and each element of a qualified immunity must be determined separately.

been established, to find that defendants' conduct "shocks the conscience of the court" and transgresses interests "so rooted in the traditions and conscience of our people as to be ranked as fundamental," I would be troubled about what result I should reach.[6] On the other hand, if required only to apply the standard as stated in the passage from *Johnson,* quoted above, I have no hesitation in finding that "the constitutional line has been crossed." It is true that the amount of force applied was not extreme, and the injuries inflicted were not severe. These factors, however, are not to be viewed in isolation; rather, they are to be considered in relation to the need for the use of force and in light of the purposes for which the force was applied.[7] The violations proved by plaintiff in this case amount to substantially more than a bare case of unprivileged interference with interests protected under state tort law. I consider as relevant to my finding that "the constitutional line has been crossed" the fact that the use of force occurred during the commission of other constitutional violations, including an unlawful arrest, an unlawful entry into the home, and unlawful searches of plaintiff's person, wallet, and car. In the circumstances of this case, the use of any force by Strangis was excessive since the arrest and the searches were themselves unlawful. In addition, the amount of force used by Strangis far exceeded the amount of force that a person in Strangis's position might reasonably have believed necessary to effect even a lawful arrest, since after Schiller had been handcuffed and placed in the patrol car, Schiller posed no threat to himself, to the police officers, or to any bystanders.[8] Moreover, I find that the force was used for malicious purposes, representing an arbitrary and capricious act of punishment by law enforcement personnel.[9] That plaintiff did not suffer severe physical and mental injury was fortuitous. In the circumstances of this case, however, that fact does not significantly diminish the wholly unjustified quality of defendants' conduct. *See Shillingford v. Holmes,* 634 F.2d at 266.

■ It is true that a very much more stringent standard—one focusing upon extreme force and severe physical injury—has been applied in cases involving claims of cruel and unusual punishment under the Eighth and Fourteenth Amendments. *See, e.g., Furtado v. Bishop,* 604 F.2d at 95–96. But such cases are generally distinguishable because they involve circumstances in which a claimant was in custody *as punishment*

---

**6.** It may be argued that the more specific findings I have made in this case are, as a matter of law, the equivalent of a finding or conclusion, whichever it may be, that defendants' conduct "shocks the conscience of the court" and transgresses interests "so rooted in the traditions and conscience of our people as to be ranked as fundamental." If that argument were upheld, I would then be troubled about an apparent mismatch between the rhetoric and its authorized meaning. The statement of the standard will be used, of course, to guide juries as well as trial judges. It is thus most important that it not be misleadingly phrased.

**7.** It may be argued that defendants' state of mind should not be relevant to a determination of whether the victim has suffered a deprivation of a right "secured by the Constitution," except to the extent that state of mind may bear on defendants' claims of good faith immunity or on plaintiff's claims for punitive damages. It is true that a plaintiff need not prove intentional misconduct by a defendant as a distinct requirement for an actionable claim under 42 U.S.C. § 1983. *Parratt v. Taylor,* 451

U.S. 527, 533–35, 101 S.Ct. 1908, 1911–12, 68 L.Ed.2d 420 (1981). Nonetheless, "the state of mind of a defendant may be relevant on the issue of whether a constitutional violation has occurred in the first place, quite apart from the issue of whether § 1983 contains some additional qualification of that nature before a defendant may be held to respond in damages under its provisions." *Baker v. McCollan,* 443 U.S. 137, 140 n.1, 99 S.Ct. 2689, 2692 n.1, 61 L.Ed.2d 433 (1979). *Cf. Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (requiring "deliberate indifference" as an element of an Eighth Amendment claim).

**8.** I need not consider whether the incident in the booking room, standing alone, might have been only the type of "push or shove" that does not rise to the level of a constitutional tort. *See Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973). In this case, as part of a sequence of events, it was a further use of physical force for an unjustified purpose.

**9.** *See* part III–E(1) *infra.*

and the defendant was privileged to use force for the purpose of effecting the lawfully prescribed punishment. Thus, it may be argued that in those cases involving Eighth Amendment claims the force used was not in excess of that permitted by law unless it was so disproportionate to the need for effecting the lawful objective of enforcing conditions of lawful confinement that it amounted to cruel and unusual punishment. These stringent standards may not apply in cases where the confinement itself is unlawful, or where the confinement is lawful but not intended as punishment. *See Pritchard v. Perry*, 508 F.2d at 425–26 (distinguishing constitutional claims by prison inmates).

The "substantive due process" analysis derived from the cases discussed immediately above and the more stringent requirements it imposes as a prerequisite to a claim actionable under 42 U.S.C. § 1983 stand in stark contrast with the Fourth and Fourteenth Amendment analysis discussed in part III–A *supra*. Yet, it is the Due Process Clause of the Fourteenth Amendment through which Fourth Amendment constraints are made applicable to the states. Can the Fourth and Fourteenth Amendment precedents be reconciled with the "substantive due process" cases? Or do they stand inherently in unresolved tension?

█ The array of precedents becomes still more puzzling when we look to cases prosecuted under 18 U.S.C. § 242. In such prosecutions for violations of a person's constitutional rights under color of state law, apparently the government is not required to prove "something more" than a police officer's use of excessive force, in violation of state law, except, of course, the proof of willfulness that is required by that criminal statute.[10] *See, e.g., United States v. McQueeney*, 674 F.2d at 113–14 (affirming convictions for assault and unlawful arrest

under 18 U.S.C. § 242 where police officers used more force than permitted under state and federal law and where officers made arrests without probable cause as defined by federal and state law); *United States v. Stokes*, 506 F.2d 771 (5th Cir.1975). *See also United States v. Villarin Gerena*, 553 F.2d 723 (1st Cir. 1977). One may argue that the "willfulness" element of the criminal statute is itself a "something more" requirement of the kind implicit in the notion that a violation of bodily security is not actionable under 42 U.S.C. § 1983 unless it "rises to the level of a constitutional tort." It is, however, a very different and less restrictive requirement than that applied in Eighth Amendment cases such as *Furtado*. If that more restrictive formulation is not applied in criminal prosecutions based on violations of the Fourteenth Amendment, why should it be applied in civil cases based on violations of the Fourteenth Amendment? No reason appears in the cases for applying a more stringent requirement against plaintiffs in civil actions under 42 U.S.C. § 1983 than against the government in prosecutions under 18 U.S.C. § 242. *Cf. Landrigan*, 628 F.2d at 741–42 (a civil action in which the court relies on *Villarin Gerena, supra*, a criminal prosecution, for the conclusion that use of excessive force or violence by a police officer violates a victim's constitutional rights). I find in precedents applying 42 U.S.C. § 1983 or 18 U.S.C. § 242 no effort to derive from constitutional or statutory text, or from legislative history, any manifestation of reasons for requiring something more than proof of the elements of a Fifth Amendment or Fourteenth Amendment claim, and no formulation of guidelines for factfinders in determining whether a "something more" standard has been met. In these circumstances, the more compelling inference is that plaintiff in this case need not satisfy a

---

**10.** As the criminal law counterpart to 42 U.S.C. § 1983, 18 U.S.C. § 242 provides in relevant part:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any

rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.

"something more" standard to prove that the "deprivations" were "without due process of law," or to prove that these Fourteenth Amendment violations are actionable under 42 U.S.C. § 1983. *See Pritchard v. Perry*, 508 F.2d at 425 ("There is no warrant for any separation of constitutional rights into redressable rights and nonredressable rights, of major and minor unconstitutional deprivations, and Section 1983 makes no such distinction and authorizes no such separation.").

■ In conclusion, although I am uncertain that I am correctly predicting the authoritative resolution of the conflicting implications of precedents, it is my best judgment that the findings I have made are sufficient to establish that plaintiff has proved a cause of action, remediable under 42 U.S.C. § 1983, on the independent ground of use of excessive force in effecting a warrantless arrest and detention. For similar reasons, I also conclude that the findings I have made are sufficient to establish that plaintiff has proved a cause of action, remediable under 42 U.S.C. § 1983 against these defendants, for the unlawful detention itself.

### C.

Plaintiff has proved that, by the conduct of persons acting under color of state law, he was deprived of "rights privileges, or immunities secured by the Constitution." The remaining issue is the extent to which either or both of the named defendants may be held liable in damages for these violations of plaintiff's civil rights.

### (1) Defendant Strangis

■ Defendant Strangis actively participated in and personally caused each violation of plaintiff's civil rights. Strangis, therefore, may be held liable in damages for these violations unless it is proved that Strangis acted with a reasonable good faith belief in the lawfulness of his conduct. *See Gomez v. Toledo*, 446 U.S. 635, 641, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980); *De-Vasto v. Faherty*, 658 F.2d 859, 865 (1st Cir. 1981).[11]

As explained in *Gomez*,

"[good faith] is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes, supra,* [416 U.S. 232] at 247–248 [94 S.Ct. 1683 at 1691–1692, 40 L.Ed.2d 90]. The applicable test focuses not only on whether the official has an objectively reasonable basis for that belief, but also on whether "[t]he official himself [is] acting sincerely and with a belief that he is doing right," *Wood v. Strickland, supra,* [420 U.S. 308] at 321 [95 S.Ct. 992 at 1000, 43 L.Ed.2d 214].

*Gomez v. Toledo*, 446 U.S. at 641, 100 S.Ct. at 1924.

---

11. In their answer, defendants did not plead the good faith defense as required by *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). At trial, however, over plaintiff's objection, I allowed defendants to raise the good faith defense for two reasons. First, plaintiff commenced this action in 1977 at a time when the law in this circuit placed the burden on plaintiff to plead and prove bad faith, rather than on defendants to plead and prove good faith. *See, e.g., Gaffney v. Silk*, 488 F.2d 1248 (1st Cir. 1973); *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977). Defendants could not reasonably be expected to anticipate a change in the law that occurred almost three years later in *Gomez*. Second, plaintiff was not prejudiced by defendants' failure to amend their answer after *Gomez* was decided. In Plaintiff's

Proposed Findings of Fact and Conclusions of Law at p. 5, ¶ 3, which plaintiff submitted in June, 1980 after *Gomez* was decided, plaintiff urged the court to conclude at trial that "defendants Strangis' and Picchione'[s] actions ... were not in good faith and therefore said defendants are not entitled to any qualified immunity." Having proposed this conclusion, which defendants specifically contested in response to this submission, plaintiff indicated his intent to present evidence bearing on this matter. Moreover, since plaintiff did in fact present evidence throughout the trial bearing on defendants' alleged bad faith, as part of plaintiff's claim for punitive damages, plaintiff demonstrated that he was fully prepared to contest the good faith defense.

■ Applying this standard to the facts of this case, I find that defendant Strangis had neither an objectively reasonable basis for believing that his conduct was lawful, nor a sincere belief that he was "doing right." Rather, I find that defendant Strangis, an experienced police officer at the time with college level education in law enforcement practices, acted with knowledge that he was exceeding his lawful authority in arresting without a warrant, intruding in the home, searching without a warrant, and using more force than he believed reasonably necessary to effect an arrest and detention.[12] Defendant Strangis, therefore, is not entitled to the good faith immunity defense.

### (2) Defendant Picchione

Defendant Picchione can be held liable in damages under 42 U.S.C. § 1983 only if it is proved that he was personally involved in causing the deprivation of Schiller's constitutional rights. *See Maiorana v. MacDonald*, 596 F.2d 1072, 1077–78 (1st Cir. 1979). It is not enough that Picchione was present at the time Strangis violated plaintiff's rights. *See, e.g., Landrigan*, 608 F.2d at 742. Plaintiff must prove that Picchione, through his own conduct, contributed to the violations.

■ From a preponderance of the evidence I find that Picchione was involved throughout the arrest, and that in the absence of proof of good faith he may be held liable for all violations of Schiller's constitutional rights that occurred during the arrest. Picchione functioned at the outset as a full partner in the investigation. He accompanied Strangis to Schiller's doorstep and remained close behind to provide visible support. When Strangis grabbed Schiller and converted the investigation (which itself was not illegal) into an unlawful arrest, Picchione continued to function as an active partner. After Strangis forced Schiller out of the house, Picchione secured Schiller's

arms, applied handcuffs, and escorted him to the cruiser. In this manner, Picchione also became a full partner in the unlawful arrest. Subsequently, except as noted in part III–D(2) *infra*, Picchione made no attempt to stop Strangis from physically abusing Schiller or from violating Schiller's Fourth Amendment and Fourteenth Amendment interests. His failure to intervene or even object to these unlawful actions reflected deliberate indifference on the part of Picchione to Schiller's rights. Moreover, in these circumstances I find that Picchione's failure to intervene or object encouraged the illegal conduct of his partner. Accordingly, Picchione is liable for having directly contributed to the violation of plaintiff's constitutional rights.

■ I also find that defendant Picchione did not have a sincere or reasonable belief that he was acting lawfully in causing these deprivations of plaintiff's constitutional rights. The facts here do not present the case of a police officer aiding a partner officer in the sincere belief that the partner has been assaulted. Picchione witnessed the unprovoked attack by Strangis on Schiller, and as an experienced police officer, understood that his partner's conduct was unlawful. Nonetheless, Picchione knowingly joined the unlawful arrest and contributed to subsequent violations of Schiller's rights. On these facts, Picchione is not entitled to a qualified immunity from liability.

### D.

■ A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. Such damages are calculated in most circumstances according to general tort law principles applicable to the types of deprivations proved. *See generally Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042,

---

12. Under the rule stated in *DeVasto v. Faherty*, 658 F.2d 859, 865 (1st Cir. 1981) defendant has the burden of proving good faith. The burden of proof is not decisive in this case, however,

since I specifically find, by a preponderance of the evidence, bad faith on the part of defendant Strangis. *See* part III–E(1) *infra*.

55 L.Ed.2d 252. The victim is entitled to compensation for economic harm, pain and suffering, and mental and emotional distress that results from the violations. *See id.* at 257–64, 98 S.Ct. at 1048–52.

■ In this case plaintiff proved that he was subjected to a series of constitutional violations during an ongoing unlawful detention. In theory, at least, it might be possible to identify separately those damages that are intended to compensate plaintiff for physical injuries attributable to the use of excessive force, and those damages that are intended to compensate plaintiff for injuries attributable to violations of plaintiff's interests in being free from unlawful physical restraint and in being free from unlawful searches and intrusions in his home. Such a separation of damages, however, is both unnecessary and impractical in the circumstances of this case. With the exception of the incident of use of force by Strangis in the booking room,[13] I have determined that Strangis and Picchione are both liable for all violations that occurred during the arrest, the detention, intrusions in the home, and the unlawful searches. There is no need, therefore, to identify damages according to each violation for the purpose of allocating damages against each defendant. Furthermore, I have determined that plaintiff's physical injuries were relatively minor, involving superficial bruises and head and neck contusions. The pain and suffering of plaintiff that is attributable directly to the use of excessive force (without regard to the other violations) is, therefore, minimal. In these circumstances I find that plaintiff sustained physical and emotional injuries as a consequence of the entire sequence of events, which events should be considered together for the purposes of determining damages. Having been taken by force from the privacy of his home in the middle of the night, physically restrained, attacked, threatened, subjected to warrantless searches, and jailed, plaintiff reacted emotionally as an ordinary individual in these circumstances would be expected to react; plaintiff experienced a sense of fear, humiliation, intimidation, frustration, and indignation. The consequences of this emotional distress were manifested in subsequent disruptions of plaintiff's eating, sleeping, and dreaming patterns, and in the stress he experienced in his relationships with friends and family. On the evidence before me, however, I find that these disruptions were neither severe nor lasting. As compensation for all elements of damages except the excessive force used by Strangis in the booking room, I find that plaintiff is entitled to an award of $3000.[14] I find additional compensatory damages in the amount of $500 against defendant Strangis alone because of the excessive force he used in the booking room.

■ In addition, plaintiff suffered economic harm as a result of being prosecuted in state court for his actions of September 25 and 26, 1976. Schiller's expenditures for legal representation during these criminal proceedings, if proved to be the consequence of defendants' illegal conduct, are recoverable as compensatory damages in this action.[15] *See Kerr v. City of Chicago,* 424 F.2d 1134, 1141 (7th Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64 (1970).

Schiller was prosecuted in state court for four offenses: assault and battery on a

---

**13.** Picchione did not participate in this event. Indeed, he properly intervened to restrain Strangis. *See* part II at 5 *supra* ; part III–D (2) *infra.*

**14.** At trial plaintiff offered evidence that his parents experienced and witnessed persecution during the years they lived in Nazi Germany, that plaintiff was told about these experiences while he was growing up (including the fact that his father is Jewish), and that because of the circumstances of his unlawful arrest plaintiff suffered intense emotional distress. On the evidence before me, however, I find that plaintiff did not suffer unusual harm arising from knowledge of his family history.

**15.** Although the payments were made by Schiller's mother on behalf of plaintiff, these amounts may nonetheless be recoverable by plaintiff in this action. *See Kerr v. City of Chicago,* 424 F.2d 1134, 1141 (7th Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 64 (1970).

police officer, disturbing the peace, operating a motor vehicle so as to endanger the public, and failing to produce a license and registration to a police officer. These charges were tried together before a jury in State Superior Court on May 18 and 19, 1977. The trial judge directed a verdict of not guilty on the charge of disturbing the peace; the jury returned a verdict of not guilty on the assault and battery charge; and Schiller was found guilty of the motor vehicle misdemeanors. On appeal, the conviction for failing to produce a license and registration to a police officer was reversed and a judgment of not guilty was entered. Plaintiff paid almost $3000 in attorney's fees for his defense during these criminal proceedings.

I find that the prosecution for assault and battery, and the prosecution for disturbing the peace were direct and foreseeable consequences of the unlawful arrest. Unlike the motor vehicle charges, the assault charge and the disturbing the peace charge were without merit, having been brought by the arresting officers to justify the unlawful arrest itself.[16] Reasonable fees associated with these two charges are recoverable in this action.

Plaintiff, of course, has the burden of proving damages, and, therefore, the burden of proving the amount of attorney's fees associated with these two criminal charges. Plaintiff proved that a specific amount was paid for the entire defense, but this amount necessarily includes fees that are not recoverable because they relate to the traffic misdemeanor charges, which were not the result of defendants' illegal conduct. Damages may not be based on speculation. It is also true, however, that damages need not be proved with exact certainty. Here, the range of uncertainty has been significantly limited by exact proof of the total expenditure for attorney's fees. Also, the Superior Court docket records (Pl. Exhibits 1–4) provide circumstan-

tial evidence of the scope of the proceedings relating to each charge, and of the reasonableness of the fees incurred. Additional circumstantial evidence was presented in the form of portions of the transcript of the criminal trial, which were used to impeach defendants' testimony in this case. I conclude that in these circumstances it does not require undue speculation to find that at least $1500 of the attorney's fees are attributable to Schiller's defense on charges of assault and battery and disturbing the peace and that such fees were reasonable. I so find. For this reason, plaintiff is entitled to $1500 additional compensation from defendants.

### E.

■ In appropriate circumstances, a person deprived of constitutional rights may also recover punitive damages under 42 U.S.C. § 1983. *See Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977); *Caperci v. Huntoon*, 397 F.2d 799 (1st Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968). As to each individual defendant, plaintiff must prove not just intentional interference with constitutional rights but in addition the presence of "bad faith," also described as "aggravating circumstances." *Alicea Rosado*, 562 F.2d at 121. Plaintiff must prove " 'malicious and wanton' disregard of plaintiff's rights." *Id.* (quoting *Paton v. La Prade*, 524 F.2d 862, 872 (3d Cir. 1975)). Furthermore, the court must consider "whether actual damages would not suffice to deter a defendant's wrongdoing." *Id.*

### (1) *Defendant Strangis*

■ I find that defendant Strangis acted with intentional and malicious disregard of Schiller's rights. By itself, a knock at the door at 3:30 in the morning to investigate a traffic misdemeanor that occurred eleven hours earlier does not constitute ille-

---

**16.** From the evidence in this case, I am unable to determine why Schiller was prosecuted for failing to produce a license and registration, and therefore, I am unable to determine whether the prosecution for this offense was also a natural consequence of defendants' illegal conduct. The record does not disclose the reason that the conviction for this charge was reversed on appeal.

gal police conduct. At a minimum, however, it does reflect indifference to an individual's privacy interests. Moreover, when the investigation follows shortly after a provocative encounter between the police officer and the same individual, and when the knock at the door is quickly followed by a false arrest, unlawful searches, an unlawful entry into the individual's home, and the use of excessive force, the evidence is compelling that the officer has acted with personal animus toward the individual. Such is the case here. I find that Strangis appeared at Schiller's home desiring to provoke an incident, and that he maliciously seized upon the opportunity to punish Schiller for the events of the previous afternoon.

I also find that because Schiller suffered relatively minor injury, compensatory damages in this case are inadequate to deter any future similar wrongdoing by defendant Strangis. At trial Strangis continued to claim that he had acted properly in making the illegal search of plaintiff's wallet and plaintiff's automobile. Even if I had credited in its entirety defendant's version of the arrest incident, this conduct would not have been justified. Punitive damages are especially appropriate in these circumstances. Accordingly, I find defendant Strangis liable for punitive damages in the amount of $5000.

### (2) Defendant Picchione

From the evidence I am unable to find that defendant Picchione acted with similar malice toward Schiller. Picchione acted unlawfully and without a reasonable belief that he was "doing right." However, I find that these actions were the result of a misplaced sense of loyalty to his partner, rather than malice toward Schiller. Schiller himself acknowledged this distinction between the two officers by his willingness to talk to Picchione but not to Strangis at

the time of the arrest. Furthermore, at the police station, after Strangis pushed Schiller against the wall Picchione demonstrated his lack of bad faith by intervening to prevent Strangis from striking Schiller again. I find that Picchione is not liable for punitive damages.

### IV.

Having determined that each defendant is liable in damages for violations of plaintiff's federally protected constitutional rights, I need not and do not consider whether plaintiff would otherwise be entitled to recover for these same violations (described either as violations of the U. S. Constitution or as violations of the Massachusetts Constitution) under Mass.Gen. Laws Ann. ch. 12 § 11I, which was enacted in November, 1979. Similarly, I do not consider whether an implied cause of action exists under Mass.Const. arts. 12, 14 (Declaration of Rights). At most, liability under these provisions would duplicate defendants' liability under 42 U.S.C. § 1983.

### V.

Based on the findings of fact and evaluative findings of parts I–III *supra*, I conclude that defendant Strangis is liable to plaintiff for having committed the following state law tort violations: assault, battery, trespass, and false imprisonment. The compensable harm to plaintiff resulting from these tortious acts is identical to the harm for which plaintiff is compensated in part III–D *supra*.[17]

Having found that defendant Picchione knowingly joined in committing the tort of false imprisonment, and by his silence encouraged Strangis to commit subsequent tortious acts (other than the use of excessive force in the booking room), I conclude that defendant Picchione is also liable

---

17. Plaintiff has not alleged the tort of malicious prosecution. Nonetheless, I conclude that under general principles governing the measure of damages for torts as applied in Massachusetts, plaintiff may recover as part of plaintiff's false imprisonment claim reasonable compensation for attorney's fees expended during the state criminal proceedings. *See generally* Restatement (Second) of Torts § 914 (1979). Cf. *M. F. Roach Co. v. Town of Provincetown*, 355 Mass. 731, 247 N.E.2d 377 (1969) (malicious interference with contractual rights); *Spillane v. Corey*, 323 Mass. 673, 84 N.E.2d 5 (1949) (action for breach of warranty and fraud).

to plaintiff under these state law tort claims in the same amount found in part III–D *supra.* *See* Restatement (Second) of Torts §§ 876, 877, 879 (1979).

These awards of compensatory damages against Strangis and Picchione under these state law tort theories are, of course, merely awards of the same damages under additional theories of liability rather than awards of additional damages.

 Since punitive damages are not recoverable under Massachusetts law unless authorized by statute, no punitive damages may be awarded under any of the pendent state law claims. *See Caperci v. Huntoon,* 397 F.2d at 801 & n.2.

### VI.

For the reasons stated in this opinion, judgment will be entered as follows:

Judgment for plaintiff against defendants Strangis and Picchione, jointly and severally, in the amount of $4500 compensatory damages;

Judgment for plaintiff against defendant Strangis in the additional amount of $500 compensatory damages;

Judgment for plaintiff against defendant Strangis in the additional amount of $5000 as punitive damages.

Plaintiff shall have interest and costs in accordance with applicable laws. Counsel will confer with the clerk forthwith and, if unable to agree on amounts due as interest and costs, will file written submissions within 14 days of entry of this opinion.

Plaintiff also claims attorney's fees. If the parties are unable to agree on this portion of the claim, counsel will appear for a brief conference with the court at 10:30 a. m., June 25, 1982, regarding the way in which this issue will be submitted for determination.