731 P.2d 171

Michael ANDERSON,
Plaintiff/Appellant/Cross-Respondent,

v.

CITY OF POCATELLO, a municipal corporation; Ron Black, individually and as a public officer of the City of Pocatello; and Bruce Gentillon individually and as a public officer of the City of Pocatello, Defendants/Respondents/Cross-Appellants.

No. 15703.

Supreme Court of Idaho.

July 29, 1986.

On Rehearing Jan. 28, 1987.

Dan Edwards of Suiter, Edwards & Gere, Eagle, for plaintiff/appellant/cross-respondent.

Jesse C. Robison (argued) and L. Charles Johnson, of Johnson, Olson, Robison, Chartered & Pocatello, for defendants/respondents/cross-appellants.

BISTLINE, Justice.

Anderson commenced a tort action against the defendants-respondents on theories of violation of his civil rights (afforded remedy under 42 U.S.C. § 1983), assault and battery, and negligence. The district court granted summary judgment to the respondents, but denied granting attorney's fees to the respondents. Anderson appeals the former holding; respondents appeal the latter. We affirm the district court's granting of summary judgment on all counts save the § 1983 claim against the officers. As to count § 1983, a genuine issue of material fact remains to be resolved.

I.

In the summary judgment proceedings, the record before the district court included the affidavits of Anderson, *see infra*, p. 176 n. 2, and his father, the affidavit of Lieutenant James H. Benham concerning the defendant officers' training, *see infra*, p. 181, and the partial transcript of plaintiff Anderson's criminal trial. As thus constituted, the record establishes the following factual setting and disputes.

At approximately 1:30 a.m. during the morning of October 18, 1982, Pocatello city police officers Ron Black and Bruce Gentillon were investigating an incident of alleged vandalism at 1117 South Fifth Avenue in Pocatello. They were greeted by the two individuals, Romriell and Nielson, who had reported the incident.

Romriell and Nielson related to the officers the following events. Earlier in the evening they had had a confrontation with a person with whom they were not previously acquainted, plaintiff Anderson, who lived in the basement apartment of a house adjacent to the apartment of Romriell and Nielson. They reported that Anderson, in an intoxicated state, had threatened one of them outside their apartment. They claimed he entered their apartment without invitation. They further claimed that when they told Anderson they were leaving for a party, Anderson attempted to invite himself along, first returning to his apartment to retrieve his cigarettes. Romriell and Nielson added that upon his departure, they quickly went on their way. On their return to their apartment several hours later, they found the windows and screen door broken out. Romriell and a friend had knocked on Anderson's door without receiving a response.

Upon the conclusion of the foregoing narration, the officers checked the interior of the vandalized apartment and then proceeded to the stairwell leading to Anderson's apartment. They knocked on his door several times, but received no answer. Anderson by deposition stated that he was awakened by persons first kicking and later pounding on his door without identifying themselves, and that he did not answer at first out of fear for his safety. The officers, in their testimony at the criminal trial, do not claim to have identified themselves. Having received no answer,

the officers exited the stairwell where they were met by Romriell.

At this point, Anderson opened his door, audibly chambered a shell into his shotgun, and emerged. Anderson claims he carried the shotgun in self-defense, and chambered the shell to announce that he was coming out. The respondents claim he kicked open the door and charged out, shouting.

The officers claim they scrambled for cover. Anderson claims they were in hiding. Anderson claims he did not point the shotgun at anyone. The officers claim he pointed it at the fleeing Romriell. Nielson so testified at Anderson's subsequent criminal trial. Officer Black shouted "freeze" to Anderson. The officers claim Anderson then turned and pointed the shotgun at them. Again, Nielson's testimony supported this account. Anderson claims he was turning to return to his apartment. Gentillon commanded, "Drop it." Anderson did not drop the gun. The officers claim Anderson continued the motion of pointing the shotgun at them, at which time they both fired almost simultaneously, each firing three rounds. Anderson claims that at the time he was shot, he had turned toward his door with the shotgun pointed straight up. Anderson was struck twice, once in the left side and once in the left buttocks.

Anderson continued to turn and ran back into his apartment. A few moments later he shouted that he was wounded and was coming out without his gun. Anderson was arrested for aggravated assault upon police officers in violation of I.C. § 18–915, and was transported to a hospital.

Anderson eventually was acquitted of aggravated assault upon police officers, and was convicted only of "intentionally, without malice" aiming a firearm at others in violation of I.C. § 18–3304.[1] Such a violation is a misdemeanor punishable by a maximum fine of $50. *Id.*

As stated earlier, Anderson filed claims under both 42 U.S.C. § 1983 and state tort law. We first will address Anderson's § 1983 claims and then his state law claims.

■■■ As a preliminary matter, we restate the standards of review pertaining to motions for summary judgment. A motion for summary judgment is proper only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R. C.P. 56(c). When the motion is supported by depositions or affidavits, the adverse party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." I.R.C.P. 56(e). The latter requirement, however, does not change the standards applicable to the summary judgment motion. *Central Idaho Agency, Inc. v. Turner,* 92 Idaho 306, 310, 442 P.2d 442, 446 (1968). Those standards require the district court, and this Court upon review, to liberally construe the facts in the existing record in favor of the nonmoving party, and to draw all reasonable inferences from the record in favor of the nonmoving party. *Anderson v. Ethington,* 103 Idaho 658, 660, 651 P.2d 923, 925 (1982). In this process the Court must look to the "totality of the motions, affidavits, depositions, pleadings, and attached exhibits," not merely to portions of the record in isolation. *Central Idaho Agency, supra,* 92 Idaho at 310, 442 P.2d at 446. Circumstantial evidence can create a genuine issue of material fact. *Petricevich v. Salmon River Canal Co.,* 92 Idaho 865, 868–69, 452 P.2d 362, 365–66 (1969). "[A]ll doubts are to be resolved against the moving party." *Ashby v. Hubbard,* 100 Idaho 67, 69, 593 P.2d 402, 404 (1979). The motion must be denied "if the evidence is such that conflicting inferences can be drawn therefrom and if reasonable

---

1. I.C. § 18–3304 provides:
   **Aiming firearms at others.**—Any person who shall intentionally, without malice, point or aim any firearm at or toward any other person shall be guilty of a misdemeanor and shall be subject to a fine of not more than $50.00 and not less than $5.00.

[people] might reach different conclusions." *Id.*

## II.

### ANDERSON'S CLAIMS UNDER 42 U.S.C. § 1983

In his complaint, Anderson alleged that the officers, under color of state law, used unreasonable force against him. This conduct, Anderson alleged, "deprived the plaintiff of liberty and property, and the privileges and immunity of a United States citizen, without due process of law, in violation of the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. § 1983." R., p. 4. Anderson alleged that "Defendant City of Pocatello was further negligent in their failure to properly screen, hire, train and supervise its police officers." R., p. 5. We first turn to Anderson's claims against the officers.

A. *Section 1983 Claims Against the Officers.*

In *Sprague v. City of Burley,* 109 Idaho 656, 664, 710 P.2d 566, 574 (1985), we observed:

It is well-established that a police officer can be found liable for damages under 42 U.S.C. § 1983 for the use of unreasonable force in effecting an arrest. *Schiller v. Strangis,* 540 F.Supp. 605, 619 (D.Mass.1982); *see Landrigan v. City of Warwick,* 628 F.2d 736, 741–42 (1st Cir. 1980); *Collum v. Butler,* 421 F.2d 1257, 1259 (7th Cir.1970).

In response to the claim that they used unreasonable force, the officers, in their pleadings, raised the defense of good faith immunity. One court described that defense as follows:

The defense of qualified immunity, which is available to local, state and federal law enforcement officers,.would protect the individual officers from liability for damages if they acted with a good faith belief based upon reasonable grounds that the measures they took were necessary. *Butz v. Economou,* 438 U.S. 478, 497–98, 98 S.Ct. 2894, 2906, 57

L.Ed.2d 895 (1978); *Maiorana v. Mac-Donald,* 596 F.2d 1072 (1st Cir.1979). *Jordan v. Five Unnamed Police Officers and Agents,* 528 F.Supp. 507, 511 (E.D.La.1981).

We perceive two circumstances in which summary judgment for defendant police officers would be appropriate. The first is where the officers acted with good faith in a manner *not clearly established as unlawful* at the time of their actions. The United States Supreme Court explained:

On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. *If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.* Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors. *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19 [102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396] (1982) (emphasis added) (footnote omitted).

The record before us provides no suggestion this circumstance existed here.

The second circumstance is where there is simply no factual dispute that the officers acted "with a good faith belief based upon reasonable grounds that the measures they took were necessary." *Jordan, supra,* 528 F.Supp. at 511. It was on this basis that the district court granted summary judgment.

The record certainly contains an abundance of evidence supporting the contention that the officers' conduct was within the boundaries of this second circumstance. The officers and witnesses Romriell and Nielson all testified that Anderson suddenly ran out of his apartment toward them. Officer Black and Nielson both testified that Anderson pointed the shotgun at the fleeing Romriell. After Officer Black yelled "freeze" and as Officer Gentillon yelled "drop it," Officer Black, Officer Gentillon and Nielson all testified that Anderson immediately turned and pointed the shot gun at them. At this point, all three testified that the officers fired at Anderson. As above stated, Anderson sub- sequently was convicted of aiming a firearm at others.

Nevertheless, Anderson gives a different account in his affidavit.[2] He asserts (without contradiction from the defendants) that those he confronted that night never identified themselves as police officers. He alleges he racked the shell into the shotgun, and then walked—not ran—outside. He denies ever pointing the shotgun at anyone during the incident. Further, he claims that even if the alleged aiming had occurred, it had ceased before he was shot. He alleges that as he walked out, someone shouted "freeze," and that he turned to return to his apartment with the shotgun in the port-arms position (pointed diagonally

---

2. Anderson's affidavit reads as follows:

I, Michael Anderson, hereby depose and state as follows:

1. On October 18, 1981, in the early morning hours, I was at home in bed asleep, when someone awakened me by trying to kick in my door. The person did not identify himself. I did not respond, out of fear for my safety. Later, someone came and knocked forcefully on the door, without identifying himself. Still I did not respond. Finally, when someone came a third time and rapped on the glass of the window in the door, I got my shotgun to defend myself and stepped outside.

2. I racked the gun before coming out to announce that I was coming out. I thought that, if the people were police (though they had not previously been acting like police), they would identify themselves. No one responded as I stepped outside.

3. Once I was outside, I saw one person running off to the left and did not point the shotgun at anyone. As I walked out, I heard someone shout, "Freeze!" I was frightened, and turned to walk back into my apartment.

4. Then someone shouted, "Drop it." At that point, my shotgun was at port-arms position, i.e., pointed diagonally upwards. Since the voice still did not identify the speaker, and I saw no one, I attempted to walk back into my apartment for safety. I did not believe, nor did I have any reason to believe, that the person shouting at me was a policeman.

5. As I stepped toward the door, I moved the shotgun from port arms toward a straight up position.

6. At that point, the Defendants fired at me numerous times, and I was shot in the side and back.

7. Later, Officer Black and Gentillon arrested me and admitted that they had shot me. They admitted at my preliminary hearing and my trial that they had not identified themselves as policemen, nor had they worn identifying hats or other insignias which I had any opportunity to see.

8. The officers testified at my trial, as they stated here, that I had pointed the shotgun at Mr. Romriel. I deny this. But this was the basis for my conviction of a misdemeanor charge of pointing a firearm at someone. I was acquitted of any assault on the police officers.

The alleged aiming of the gun at Mr. Romriel, according to the officers testimony, had previously ceased. And I certainly posed no threat to Mr. Romriel at the time I was repeatedly shot by the officers.

9. I never aimed a firearm at the officers, discharged a firearm, or made threatening statements to the officers. As a veteran, I can state that there was no reasonable basis for the officers to believe that they were in danger.

10. The officers could easily have disarmed me as I came out of my apartment, had they not taken cover and assumed firing positions instead.

11. If the officers had identified themselves, I would certainly have dropped the shotgun and cooperated fully.

12. It would not have been possible for me to fire a shotgun, at all accurately from the waist-level position where they claim I was holding the gun.

13. At the time I was shot, I was trying to do nothing except reenter my apartment.

14. The foregoing statements are based on my personal knowledge and statements made by the Defendant policemen in my presence. I have no personal knowledge as to the content of the officer's training and the selection process; and so cannot establish these facts unless I am allowed to do discovery.

upward). He alleges that then someone, unseen by Anderson, shouted "drop it" as he attempted to walk back towards the door, now with the shotgun pointed straight up. At this point, according to Anderson, the officers shot him in the back and side. Anderson's account quite obviously conflicts with the officers' claim that their belief that their actions were necessary was based on *reasonable* grounds. The fact that Anderson was shot in the back and side inferentially supports his claim that he had turned back toward his door at the time he was shot. The fact that the officers never identified themselves also supports his claim that the officers had not acted reasonably. A jury could believe Anderson's testimony, and disbelieve the testimony of all others present.

Although the district court did not so rule, the defendants argue that Anderson's criminal misdemeanor conviction for aiming a firearm at others operates to collaterally estop him from asserting to the contrary in this action. The question of whether a prior criminal conviction can act as collateral estoppel, or issue preclusion, in a subsequent civil action is a question of first impression before this Court. The closest this Court has come to the question was in *Mattson v. Bryan*, 92 Idaho 587, 591, 448 P.2d 201, 205 (1968), in which this Court held that a plea of guilty to the crime of involuntary manslaughter is *admissible* in a civil action involving the same factual situation.

■ The question of whether a conviction can act as *collateral estoppel* in a subsequent civil action is distinct from and unaffected by the question of whether a guilty plea or conviction is admissible. As Professor Wigmore explained:

> The theory of the use of judgments is not a matter to be lightly dogmatized about; yet it seems clear that the operation of recognizing it, when produced from an-

other court, in support of a plaintiff or in defense of a defendant, is upon analysis not at all an employment of evidence. It is rather the *lending of the court's executive aid, on certain terms,* to a claimant or a defendant, *without investigation* of the merits of fact. 4 Wigmore, *Evidence* § 1346 (Chadbourn rev.1972) (emphasis original); *accord,* Note, *Judgments as Evidence,* 46 Iowa L.Rev. 400 (1961); J. Weinstein and M. Berger, 4 *Weinstein's Evidence* para. 803(22) [01] (1984).

Collateral estoppel is a rule of the general doctrine of *res judicata.*[3] Under the general doctrine, "the [former] judgment establishes legal barriers against relitigating the matters involved in the action." Fleming and Hazard, *supra,* § 11.1, p. 529. Under the specific rule of collateral estoppel, in actions involving different claims than those involved in a former judgment, in some circumstances the former judgment can "operate[ ] as an estoppel as to those matters in issue or points controverted, upon the determination of which the finding or verdict [is] rendered." *Cromwell v. County of Sac,* 4 Otto 351, 353, 94 U.S. 351, 353, 24 L.Ed. 195 (1877). Because this rule of collateral estoppel involves the effect of a prior judgment on a subsequent action as a matter of *substantive* law, the admissibility of the prior judgment itself in the subsequent action is not in question. E. Cleary, *McCormick on Evidence,* § 318, p. 894 (3d ed. 1984). We turn now to the question of whether the rule of collateral estoppel is applicable here.

In times past, courts were reluctant to permit prior criminal convictions to act as collateral estoppel in subsequent civil suits involving the same issues. *See generally* 46 Am.Jur.2d, *Judgments,* § 614. The primary reasons given were the different standards of proof in criminal and civil actions, and the absence of mutuality in the effect of the estoppel. *See Chantangco v. Abaroa,* 218 U.S. 476, 481, 31 S.Ct. 34, 35,

---

3. The general doctrine of *res judicata* is not to be confused with the specific rule of *res judicata,* or claim preclusion, which is "the effect of the former judgment where the latter action

proceeds on all or part of the very claim which was the subject of the former." J. Fleming and G. Hazard, *Civil Procedure* § 11.3, p. 532 (2d ed. 1977) (hereinafter Fleming and Hazard, *supra*).

54 L.Ed. 1116 (1910); *see generally* 1B *Moore's Federal Practice* para. 0.418[1] (2d ed. 1984).

■ However, of more recent times, courts have come to recognize the fallacy of these concerns. As Professor Moore explains regarding the concern over varying standards of proof, the defendant in a criminal action resulting in conviction "is surrounded by greater safeguards than in civil litigation, and the standard of proof to which the complainant is held is higher...." 1B *Moore's Federal Practice, supra.*[4]

The doctrine of mutuality in this context is equally illfounded. Under that doctrine, "neither party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326–27, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). The premise for this was that "it is somehow unfair to allow a party to use a prior judgment when he himself would not be so bound...." *Id.* at 327, 99 S.Ct. at 649. This doctrine "provided a party who had litigated and lost in a previous action an opportunity to relitigate identical issues with new parties." *Id.*

Courts and commentators generally have criticized and discarded the mutuality doctrine. *E.g., B.R. DeWitt, Inc. v. Hall,* 19 N.Y.2d 141, 278 N.Y.S.2d 596, 600, 225 N.E.2d 195, 198 (1967) (mutuality of estoppel "is a dead letter."). As Justice Traynor observed:

> No satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as res judicata against a party who was bound by it is difficult to comprehend. See 7 Bemtham's Works, Bowring's Ed., 171. *Bernhard v. Bank of America Nat. Trust & Savings Ass'n,* 19 Cal.2d 807, 122 P.2d 892, 895 (1942).

Collateral estoppel serves the purposes "of protecting litigants from the burden of relitigating an identical issue with the same party or his privy[,] of promoting judicial economy by preventing needless litigation," *Parklane Hosiery, supra,* 439 U.S. at 326, 99 S.Ct. at 649; *see also Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971), of preventing inconsistent decisions, and of encouraging reliance on adjudications. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). To permit relitigation of an issue that was fully and fairly litigated and lost in a prior action undermines the worthwhile purposes of the collateral estoppel rule without serving any other recognizable good purpose. This is particularly true when the party sought to be estopped was the defendant in a prior criminal action resulting in conviction, where the safeguards and burden of proof favored the defendant. *See Allen, supra.*

The more appropriate test for whether collateral estoppel should apply includes the following: (1) Did the party "against whom the earlier decision is asserted ... have a 'full and fair opportunity to litigate that issue in the earlier case.'" *Allen, supra,* 449 U.S. at 95, 101 S.Ct. at 415, *citing Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) and *Blonder-Tongue, supra,* 402 U.S. at 328–29, 91 S.Ct. at 1442–43. (2) Was the issue decided in the prior litigation "identical with the one presented in the action in question?" *Bernhard, supra,* 122 P.2d at 895, *quoted in Blonder-Tongue, supra,* 402 U.S. at 323, 91 S.Ct. at 1440. (3) Was the issue actually decided in the prior litigation? This may be dependent on whether deciding the issue was "necessary to [the prior] judgment." *Allen, supra,* 449 U.S. at 94, 101 S.Ct. at 414; *citing Montana, supra,* 440 U.S. at 153, 99 S.Ct. at 973; *Rajspic v. Nationwide Mutual Insurance Co.,* 104 Idaho 662, 665, 662

---

**4.** Conversely, a judgment of acquittal only demonstrates that the prosecution failed its heavy burden of proof beyond a reasonable doubt. The same proof might satisfy the lighter burden in a civil action. Consequently, a judgment of acquittal does not conclude any issues as to civil liability. *Id.; Taylor v. Taylor,* 275 N.C. 130, 125 S.E.2d 373, 375 (1962).

P.2d 534, 537 (1983); *Pocatello Industrial Park v. Steel West, Inc.*, 101 Idaho 783, 786, 621 P.2d 399, 402 (1980) ("In order for the doctrine of collateral estoppel to apply, the issue in question must have *actually* been litigated and resolved in the prior suit." (Emphasis in original; citations omitted.)). (4) "Was there a final judgment on the merits?" *Bernhard, supra,* 122 P.2d at 895; *quoted in Blonder-Tongue, supra,* 402 U.S. at 323, 91 S.Ct. at 1440. (5) "Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?" *Bernhard, supra,* 122 P.2d at 895, *quoted in Blonder-Tongue, supra,* 402 U.S. at 323–24, 91 S.Ct. at 1440.

◼ In accordance with the modern and better view, we are constrained to hold that under the conditions described above, collateral estoppel bars the relitigation of an issue determined in a criminal proceeding in which the party sought to be estopped had a full and fair opportunity to litigate that issue. *See Allen, supra,* 449 U.S. at 102–05, 101 S.Ct. at 419–21; *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 568, 71 S.Ct. 408, 413, 95 L.Ed. 534 (1951), *reh. denied,* 341 U.S. 906, 71 S.Ct. 610, 95 L.Ed. 1345 ("It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding."); *Fontneau v. United States,* 654 F.2d 8, 10 (1st Cir. 1981); *McNally v. Pulitzer Publishing Co.,* 532 F.2d 69, 76 (8th Cir.1976), *cert. denied,* 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131; *United States v. Pennsylvania State Police,* 548 F.Supp. 9, 13 (E.D. Pa.1982); *Engleman v. Harvey,* 518 F.Supp. 655, 656 (E.D.Mo.1981); *Securities and Exchange Commission v. Everest Management Corp.,* 466 F.Supp. 167, 172–73 (S.D.N.Y.1979); *Wolfson v. Baker,* 444 F.Supp. 1124, 1127 (M.D.Fla.1978), *aff'd,* 623 F.2d 1074 (5th Cir.1980), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981); *S.T. Grand, Inc. v. City of New York,* 32 N.Y.2d 300, 344 N.Y.S.2d 938,

940–43, 298 N.E.2d 105, 107–08 (1973); *Read v. Sacco,* 49 A.D.2d 471, 375 N.Y.S.2d 371, 374 (1975); *see generally Moore's Federal Practice* para. 0.418[1] (2d ed. 1984). This is specifically the case when the subsequent civil action is pursuant to § 1983. *Allen, supra.*

◼ Whether or not the party against whom estoppel is attempted had a full and fair opportunity to litigate the issue which is the subject of estoppel comes into question when the offense involved was minor.[5] Defendants in actions involving criminal misdemeanors or traffic infractions may lack incentive to vigorously defend. *McCormick, supra,* pp. 894–95. The resulting conviction thus may not derive from a full and fair litigation. *Id.* For this reason, in most circumstances a conviction for a relatively minor matter such as a lesser misdemeanor, traffic infraction, or matter of like import should not act as collateral estoppel in a subsequent civil action. *Gilberg, supra,* 441 N.Y.S.2d at 52, 423 N.E.2d at 810 (conviction for petit offense of harassment does not estop defendant from denying assault in subsequent civil action); *Kirkendall v. Korseberg,* 247 Or. 75, 427 P.2d 418, 419 (1967) (judgment forfeiting bail after traffic citation inadmissible in subsequent civil action for personal injuries); *Loughner v. Schmelzer,* 421 Pa. 283, 218 A.2d 768, 769 (1966) (conviction for failure to drive on the right half of highway is inadmissible in subsequent civil action for personal injuries, though felony conviction would be); *Hurtt v. Stirone,* 416 Pa. 493, 206 A.2d 624, 627 (1965), *cert. denied,* 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (conviction for minor offense, including traffic violations and lesser misdemeanors is not conclusive in subsequent civil action).

◼ In this case, although Anderson was convicted of a misdemeanor, he was charged with and tried for the felony offense of aggravated assault on police offi-

---

**5.** For a thorough discussion of the various factors concerning whether a party had a full and fair opportunity to litigate a prior determi-nation, *see Gilberg v. Barbieri,* 53 N.Y.2d 285, 441 N.Y.S.2d 49, 51–53, 423 N.E.2d 807, 809–10 (1981).

cers, and would be expected to have a strong motive for resisting the action. In fact, Anderson did vigorously defend against the felony charge, and also the lesser included offense of aiming a firearm at someone, which he denied. Tr., pp. 136, 142. Clearly he was afforded a full and fair opportunity to defend against that charge, and utilized it. The criminal action culminated in a jury verdict and final judgment of conviction on the merits. That conviction was not appealed.

The key question before us is *what* the prior judgment decided and *the import on the instant civil action of that which was decided* at the criminal trial. What was decided "must be determined ... upon an examination of the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts." *Emich Motors, supra,* 340 U.S. at 569, 71 S.Ct. at 414. An examination of the transcript of Anderson's trial demonstrates that the reasonableness of the conduct of the officers was not put in issue, and hence was not necessarily decided. The factual issue decided in the criminal trial was that Anderson had pointed his shotgun at someone, at some point in time. That much he should be held estopped from denying.

In the criminal trial there was testimony that Anderson had pointed his shotgun in the direction of all persons present, and there was Anderson's contrary testimony that he had not aimed the shotgun at anyone, although he may have accidentally pointed it at someone at some point. Thus, the jury could have determined that Anderson initially had pointed the shotgun at Romriell or the officers, but that he had ceased pointing the shotgun at anyone at the time the officers shot him. Clearly, it cannot be said that the jury necessarily decided that Anderson was pointing the shotgun at anyone at the time he was shot. Accordingly, Anderson's conviction for having aimed his shotgun at someone at some point does not estop him from denying, as he does in his affidavit, that he was not pointing the shotgun at anyone *at the time the officers shot him.* Nor is he estopped

from alleging as he does that the officers acted without a good faith belief based upon reasonable grounds that the measures they took were necessary. *Pocatello Industrial Park, supra,* 101 Idaho at 786, 621 P.2d at 402.

■ Because the evidence renders conflicting inferences, a genuine issue of material fact remains as to whether the officers acted with a good faith belief based upon *reasonable grounds* that the measures they took were necessary. *Ashby, supra,* 100 Idaho at 69, 593 P.2d at 404. Some doubt remains as to whether the officers had reasonable grounds for their actions, and all doubts are to be resolved against the moving party. *Id.* Accordingly, we must reverse the district court on this issue.

B. *Section 1983 Claims Against the City of Pocatello.*

Under 42 U.S.C. 1983, the City of Pocatello cannot be held liable for the actions of the officers upon a theory of *respondeat superior. Sprague, supra,* 109 Idaho at 661, 710 P.2d at 571, *citing Monell v. New York City Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). However, Anderson alleges that the city's liability flowed from its negligent "failure to properly screen, hire, train and supervise its police officers." R., p. 5. As we noted under identical circumstances in *Sprague:*

> Hence, his claim did not rest on the mere fact that the officers were employees or agents of the City but rather was premised on the assertion that the City itself had, through its allegedly inadequate training of its officers, created the situation that proximately caused his injuries. This *may* be sufficient notice pleading to meet the requirement set out in *Monell,* that a plaintiff allege the constitutional harm was caused by a "policy statement, ordinance, regulation, or decision promulgated or adopted by" the municipality. *Sprague, supra,* 109 Idaho at 662, 710 P.2d at 572 (emphasis original).

In support of its motion for summary judgment, the city submitted the affidavit of James H. Benham, the lieutenant in charge of training for the Pocatello City Police Department. Lieutenant Benham testified:

2. Included within my duties is the monitoring of all police training and record keeping regarding the training of police officers.

3. All Pocatello police officers are required to become "POST" (Police Officers Standards and Training Academy) certified within their first year of employment with the Pocatello City Police Department. In order to become POST certified, the officers must attend the academy course in Boise which lasts approximately five weeks.

4. An officer cannot become POST certified until he has completed the POST program and has spent a year on the police force. Included within the POST training are courses and instruction regarding the firing of weapons and the use of deadly force on the job.

5. In addition, the City of Pocatello Police Department gives instruction to its officers not to use deadly force unless necessary to defend the officers or others from serious injury. Each officer is given a copy of the entire City Manual regarding police officer procedures at the time of their employment.

6. While employed as police officers for the City of Pocatello, each officer is required to attend numerous training seminars on an on-going basis to increase the officers' skills in performing their duties. During the year 1983, the Pocatello City Police Officers completed approximately 6,500 total hours of in-service training. This amounted to approximately eighty hours of in-service training per officer in the police department.

7. The officers specifically named in this lawsuit both received POST academy training prior to the incident at issue. Officer Bruce Gentillon received his POST training from October 15, 1979 through November, 1979. Each year the officers are required to meet department qualifications which include a "N.R.A." short course, a stress course, and a metal target course. Officer Gentillon, prior to the occurrence at issue, last completed the re-qualification course for the department in September of 1981, having received POST training several years before the incident at issue. The officer passed all tests.

8. Officer Ron Black was employed by the Pocatello Police Department on July 27, 1981. He was explained the City of Pocatello police procedures by Steve Wilkey on July 28, 1981.

9. From August 31, 1981 to October 2, 1981, officer Black was assigned to the Post Academy in Boise. While in Boise he received instruction there regarding firearms use and use of deadly force. Officer Black was also required to pass the police department's examination regarding the use of his firearm on the firing range.

10. Both officers were properly instructed and trained in the use of their firearms and the use of deadly force, as are all officers in the Pocatello City Police Department.

In short, Lieutenant Benham testified that the police department thoroughly trains, tests, and supervises its officers in the use of deadly force.

■ Anderson offers nothing to contradict this account. His affidavit did not relate in any way to his allegations concerning negligent hiring, screening, training, and supervising. The single incident standing by itself is not enough to support an inference that the city had an official policy or practice which led to Anderson's injuries. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2435–36, 85 L.Ed.2d 791 (1985).

■ In his reply brief, Anderson related the following:

Plaintiff sought to engage in discovery to establish the facts underlying this claim. However, discovery was denied, on the basis that the individual police officers had been dismissed out on their

good faith immunity defense. Appellant's Reply Brief, pp. 7–8.

Inexplicably, Anderson failed to raise as an issue on appeal the denial of his discovery motion.

Moreover, the record does not contain the denial of Anderson's motion. Anderson's motion is contained, as is the defendants' motion for a protective order, but the disposition of the district court is absent. "The appellant has the initial burden of presenting a record sufficient to enable an appellate court to decide the case." *State ex rel. Hodges v. Hodges*, 103 Idaho 765, 653 P.2d 1177 (1982). Here, Anderson failed his burden. This Court is unable to find error in an order of the district court which is not in the record. For all this Court knows, the denial of discovery might have been well justified.

The resulting record provides uncontroverted evidence that the city was not negligent as alleged. This Court is bound by the existing record on appeal. There appearing no genuine issue as to the negligence of the city, the motion for summary judgment in favor of the city was properly granted. As in *Hodges*, "[i]n the absence of an adequate record, or a sufficient reason for the failure to produce a record, we affirm the trial court." *Id.* at 766, 653 P.2d at 1178.

### III.

### ANDERSON'S STATE LAW CLAIMS

A. *Negligence Claim Against the City of Pocatello.*

██ As just explained, the city offered testimony that it was not negligent in its training and supervision of its officers, which testimony Anderson failed to contradict. Anderson further failed to allege as error the denial of his discovery motion, and failed to present a record containing any basis for this Court to consider the disposition of the discovery motion. The

motion for summary judgment was properly granted. *Id.*

B. *Assault and Battery Claim Against the Officers.*

Anderson stated a claim for assault and battery against the officers.[6] The district court ruled that his claim was barred by I.C. § 6–904(4), which provides:

> **Exceptions to governmental liability**—A Governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:
>
> . . . .
>
> 4. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

There is no allegation that the officers acted outside the course and scope of their employment, or with criminal intent. In his brief, Anderson argues only that whether the officers acted with malice is a jury question. The presence of malice would render inapplicable the assault and battery exception. I.C. § 6–904.

██ The term malice has been variously defined. *See generally* 52 Am. Jur.2d, *Malice,* § 1. At a minimum, malice involves the intentional commission of a wrongful or unlawful act without legal justification or excuse, whether or not the injury was intended. *Tinker v. Colwell*, 193 U.S. 473, 485–86, 24 S.Ct. 505, 508, 48 L.Ed. 754 (1903). This is referred to as "legal" malice. 52 Am.Jur.2d, *Malice,* § 1. However, the use of the disjunctive term "or" in the phrase "without malice or criminal intent" indicates that malice as used here qualitatively differs from criminal intent. I.C. § 6–904. Criminal intent closely equates to the above definition of "legal" malice. Thus, the term malice as used in § 6–904 must refer to more than mere "legal" malice. Malice here must refer to "actual malice." *Accord, Ladnier v. Mur-*

---

6. Anderson also alleged the officers' conduct was negligent as well as an assault and battery. Even if this is so, such negligence did not proxi-mately cause his injuries. Rather, the alleged intentional assault and battery caused his injuries.

*ray,* 572 F.Supp. 544, 549–50 (D.C.Md. 1983), *reversed in part on other grounds,* 769 F.2d 195 (4th Cir.1985). "Actual" malice encompasses the common meaning of the word, which connotes ill will. 52 Am. Jur.2d, *Malice,* § 1. We conclude and hold that malice here means "actual" malice, which we define as the intentional commission of a wrongful or unlawful act, without legal justification or excuse and *with ill will,* whether or not injury was intended.

▮ An examination of the record belies the complaint's bare allegation of malice.[7] It is true that Anderson alleged facts concerning the circumstances of the shooting which make the question of whether the officers' actions were based on *reasonable* grounds an issue of fact for the jury. *See* part II.A., *supra.* However, Anderson alleges nothing in his affidavit, nor did he testify to anything at his criminal trial, from which one could reasonably infer any *ill will* on the part of the officers. The record reflects without dispute that the officers were responding (reasonably or unreasonably) to a rapidly evolving situation with apparent and imminent danger. In the face of this record, Anderson was not entitled to rest upon the allegation of malice in his pleadings but was required to "set forth specific facts showing that there is a genuine issue for trial." I.R.C.P. 56(e). Anderson having failed in this regard, the district court properly granted the motion for summary judgment as to the assault and battery claim pursuant to I.C. § 6–904(4). Accordingly, the district court is affirmed on this issue.

The judgment of the district court is affirmed in all respects save the § 1983 claim against the officers. That claim is remanded to the district court.

There shall be no award of costs or attorney's fees.

DONALDSON, C.J., and HUNTLEY, J., concur.

SHEPARD, J., dissents without opinion.

BAKES, Justice, concurring in the result:

I concur in the result in this matter, recognizing that since this case was briefed and argued to this Court the Supreme Court of the United States has substantially changed the standard for proving a cause of action under 42 U.S.C. 1983 in the case of *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). It would be better if we briefed and reargued this matter prior to issuing an opinion. If counsel feel that the *Daniels* case is significant in evaluating the facts of this case, we may well need to rehear it.

## ON REHEARING

Respondents' Petition for Rehearing having been granted, and oral argument having been heard, Donaldson, Bistline, and Huntley, JJ., continue to adhere to the views expressed in the majority opinion of July 29, 1986.

DONALDSON and HUNTLEY, JJ., concur.

BISTLINE, Justice, concurring.

I write separately to offer a few brief observations on the dissent of Justice Bakes. I will address his two arguments in order.

### I.

Justice Bakes necessarily is obliged to rely on the High Court's *Daniels* case which he briefly mentioned in his first opinion last spring, and which precipitated the petition for rehearing, as barring Anderson's claim against the police officers. As Justice Bakes admits, *Daniels* only bars actions based on 42 U.S.C. § 1983 which are grounded in negligence. What Justice Bakes does not see, but what is nevertheless so obvious, is that Anderson's claim against the police officers is ground-

---

**7.** In fact, it required a generous construction of Anderson's pleadings to derive the allegation of malice itself.

ed in intentional misconduct, as well as negligence, the former of which *Daniels* does not bar.

Justice Bakes' "careful analysis of plaintiff's complaint" fails to quote and is seen to virtually ignore the following allegation therefrom:

> On or about the 18th day of October, 1981, in the city of Pocatello, the defendants Black and Gentillon, in the course of their duty and the conducting of an investigation, *did deliberately and intentionally shoot the plaintiff with handguns,* thereby causing him to suffer physical and emotional injuries. R., p. 3 (emphasis added).[1]

Justice Bakes carefully relegates his discussion of this allegation, which is fatal to his argument, to his footnote no. 2. There, his argument self-destructs with this admission: "It is readily conceded by all that the officers did intentionally shoot Anderson." Precisely so. The question to be answered at trial, however, is whether or not they did so reasonably.

Justice Bakes attempts to equate the intentional act of the officers of shooting Anderson with an intentional act such as speeding which unintentionally results in an injury to another. The two such circumstances are readily distinguishable. Simply put, it cannot be denied that it is an intentional tort to without justification aim at another, intending to shoot him or her, pull the trigger, and wound that person. If death ensued, absent a showing of reasonable conduct in justification, in criminal law it would be a homicide.

Justice Bakes perhaps wishes the facts more resembled those of *Dunster v. Metropolitan Dade County,* 791 F.2d 1516 (11th Cir.1986). There, an off-duty officer became involved in a barroom brawl. He drew and cocked his pistol. "At this point the deceased, James Dunster, who was not in [Officer] Aydelotte's line of vision, allegedly jumped into Aydelotte and knocked him backwards. Aydelotte fell to the ground at which time the gun fired, fatally wounding James Dunster." *Id.* at 1518. The Court explained:

> In the district court, the plaintiffs contended that Officer Aydelotte and Dade County *negligently* violated the deceased's right to due process under the Fourteenth Amendment. The district court charged the jury on negligence and the special interrogatories submitted to the jury were based on negligence. It is now clear, however, that negligent conduct of state officials cannot give rise to a valid Fourteenth Amendment claim. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Because the plaintiffs' case was premised on a theory of negligence, the jury verdict cannot be sustained under the Fourteenth Amendment. *Id.* at 1518 (emphasis original, footnote omitted).

The instant officers were not knocked down, at which point their guns discharged. They were not aiming at a nearby tree, at which point Anderson leaped into their line of fire. They intentionally shot Anderson, as Justice Bakes "readily conceded." Anderson's case is not "premised on a theory of negligence," *id.*; it is premised on deliberate and intentional use of excessive force. Such claims, as ought to be "readily conceded," are not barred by *Daniels.* *E.g., id.; Waggoner v. Mosti,* 792 F.2d 595 (6th Cir.1986); *New v. Minneapolis,* 792 F.2d 724 (8th Cir.1986); *Fernandez v. Leonard,* 784 F.2d 1209 (1st Cir.1986).

## II.

The remainder of Justice Bakes' dissent consists of a remarkable attempt to draw all inferences and resolve all doubts *against* the party not moving for summary judgment. Never does Justice Bakes devote himself to what the rules of procedure

---

1. Clearly this allegation, together with Anderson's allegations that the officers' actions constituted an assault and battery which violated his constitutional rights, equates with the use of unreasonable force. Thus, Justice Bakes' accusation that we had "erroneously assert[ed]" that Anderson's complaint had alleged unreasonable force is false as well as inconsequential.

require us to do, which is to draw inferences and resolve doubts for Anderson. His efforts on behalf of the police officers succeed only in arranging inferred facts into fragile house of cards. Moreover, this house of cards is built on quicksand, in that his contortions fall short of ruling out reasonable inferences supporting Anderson's allegations of excessive force.

The record does not inform us of all the charges against Anderson, nor of how the jury was instructed as to those charges. Nevertheless, Justice Bakes is quite willing to resolve this uncertainty against the nonmoving party in order to conclude that Anderson *must have* been convicted of aiming his shotgun at the officers. It is Justice Bakes who would "recast" the record.

The record contains conflicting testimony as to when Anderson aimed the shotgun. The testimony includes Anderson's own, through his affidavit, that the aiming had ceased at the time he was shot. Nevertheless, Justice Bakes ignores that testimony and resolves these inconsistencies against the nonmoving party by making his own appellate factual determination that Anderson must have aimed at the officers only a split-second before he was shot.[2]

The record contains Anderson's vague oral testimony at trial on the location of his wounds, augmented by a physical demonstration. However, the record also contains his testimony through his affidavit that he was shot in the back.[3] Justice Bakes is willing to conclude that he was not shot in the back.

Even accepting, *arguendo*, Justice Bakes' argument that Anderson is precluded from denying he aimed at the officers, and that he was only shot in the left side, it is quite possible to infer from the record, as we must, the following: Anderson walked out his door, and immediately aimed his shotgun at figures he could not identify as officers, and who did not identify themselves as officers, and then ceased aiming. These unidentified individuals yelled at him to "freeze" and "drop it." [4] He then turned to return to his apartment with the gun pointed upright when he was shot in the left side. At this point he was facing south, toward his door, and away from the officers. The time elapsed from his emergence and aiming to the point at which he was shot while facing away from the officers and toward his door could have been close to fifteen seconds. This construction of the facts, *accepting* Justice Bakes' errant assumptions, but otherwise arrived at through resolving doubts and drawing other inferences in favor of the nonmoving party, paints a picture of the police officers using unreasonable force. Anderson alleges far more than merely that the officers failed to identify themselves and that he never aimed at the officers. He alleges that they shot him without justification under the circumstances then existing.

Of course, the officers and the other witnesses may vigorously dispute these "facts," assuming Anderson persists in the suit. A jury will decide whom to believe. A majority of this Court will not usurp the jury's function.

BAKES, Justice, dissenting:

At the time that this case was originally briefed and argued to this Court, the controlling federal authority interpreting a 42 U.S.C. § 1983 cause of action was the case of *Parratt v. Taylor*, 451 U.S. 527, 101

---

**2.** Contrary to Justice Bakes' suggestion, Anderson's testimony that the gun at one point was "pointing" in the direction of the officers does not equate with an admission that he *aimed* it at them. Again, Justice Bakes resolves doubts against Anderson.

**3.** Justice Bakes apparently failed to read the affidavit in his haste to accuse us of misrepresentation.

**4.** We do not assume the officers were *required* to identify themselves. However, unlike Justice Bakes, we do recognize that the undisputed fact that they did not is relevant to and supports Anderson's contention that the officers acted unreasonably in shooting him. Anderson contends: "If the officers had identified themselves, I would certainly have dropped the shotgun and cooperated fully."

S.Ct. 1908, 68 L.Ed.2d 420 (1981), which held that mere negligent conduct on the part of police officers could implicate the remedial provisions of § 1983. However, following the argument in this case, but prior to the release of our initial opinion, the United States Supreme Court, in two very significant opinions, reversed the ruling in the *Parratt* case and concluded that mere negligence does not implicate the provisions of 42 U.S.C. § 1983. We granted rehearing to permit the parties to brief and reargue the effect that these two recent United States Supreme Court cases, *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); and *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), should have on the appellant's claim in this case. The majority of this Court now concludes that these two cases do not change the result which we arrived at in our original opinion in this case, asserting that plaintiff Anderson's complaint alleges more than a negligence cause of action. However, a careful analysis of the plaintiff's complaint, and the submissions in support of and in opposition to the motion for summary judgment, clearly establish that the plaintiff's claim is basically for negligent conduct which does not reach to the level necessary to constitute a cause of action under 42 U.S.C. § 1983, as most recently interpreted in *Daniels* and *Davidson*. For that reason, I dissent.

### I.

In his complaint before the trial court and in his brief on appeal to this Court, Anderson asserts a § 1983 cause of action against both the City of Pocatello and the individual police officers involved in the shooting incident at issue in this case. He asserts that the conduct of the officers and the city deprived him of his constitutional rights guaranteed by the fourteenth amendment. In both those documents, the § 1983 claim is premised on a theory of negligence. In his complaint, Anderson alleges as follows:

"*The conduct of the [police officers]* in their investigation *was negligent* and failed to conform to accepted police standards ... in ways including, ... the improper manner of awakening the plaintiff and aprizing [sic] him of the investigation, ... the failure of the police officers to indentify [sic] themselves in the course of an investigation of this nature, ... *the negligent shooting and wounding of the plaintiff,* and similar acts and omissions which constitutes negligence. Defendant City of Pocatello was *further negligent* in their failure to properly screen, hire, train and supervise its police officers." (Emphasis added.)

And in his brief on appeal, Anderson's argument focused solely on his assertion that: "[n]egligence can state a § 1983 claim. *Parratt vs. Taylor*, 451 U.S. 527, 101 S.Ct. 1908 [68 L.Ed.2d 420] (1981) ... *Here there is an issue of negligence in the officers'* pre-dawn investigation of a minor misdemeanor, their failure to identify themselves, and their over-reaction and *use of excessive force.*" Appellant's Brief at 4 (emphasis added).

In the recent case of *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the United States Supreme Court reversed the holding of the *Parratt* case that negligence will support a cause of action under § 1983 where the constitutional rights involved are those found in the fourteenth amendment. The court in *Daniels* found no remedy existed under the Due Process Clause of the Fourteenth Amendment "for injuries inflicted by governmental negligence...." 106 S.Ct. at 666. Thus, to the extent that appellant Anderson asserts a § 1983 claim premised on negligence, his claim must fail and the majority errs in failing to so hold.

As the Supreme Court noted in *Daniels v. Williams, supra,* and in the companion case of *Davidson v. Cannon, supra,* the purpose served by a § 1983 action is to "requir[e] the government to follow appropriate procedures when its agents decide to 'deprive any person of life, liberty, or property'...." *Daniels v. Williams,* 106 S.Ct. at 665. The remedy provided under § 1983 serves to prevent affirmative abuses of

governmental power; "it serves to prevent governmental power from being 'used for purposes of oppression.'" *Id.* The holdings of the Supreme Court in the *Daniels* and *Davidson* cases effectively require a plaintiff such as appellant Anderson to allege that the governmental officials' actions against him constituted an abuse of governmental power, or that the officers' conduct did not conform to appropriate governmental standards, practices or procedures; in short, that the officers acted with "deliberate or callous indifference to" his constitutional rights. *Davidson v. Cannon, supra.* Anderson has failed to allege such conduct either in his complaint or in his affidavit in opposition to the motion for summary judgment. In both those documents, and particularly in his complaint, Anderson merely alleges that the officers' actions evidenced a lack of due care under the circumstances. In that portion of his complaint where issues regarding police procedure are discussed, Anderson's allegations are couched solely in terms of negligence.

> "The *conduct of the defendants* [police officers] in their investigation *was negligent* and failed to conform to accepted police standards, practices, procedures, in ways including, but necessarily [sic] limited to, the improper manner of awakening the plaintiff and aprizing [sic] him of the investigation, ... the failure of police officers to indentify [sic] themselves in the course of an investigation of this nature, ... *the negligent shooting and wounding of the plaintiff,* and sim-

ilar acts and omissions *which constitutes negligence."* (Emphasis added.)

The only allegation regarding use of excessive force is that found in Anderson's brief on appeal[1] and, again, it is cast solely in terms of negligence. "Here there is an issue of *negligence* in the officers' pre-dawn investigation of a minor misdemeanor, their failure to identify themselves, and their over-reaction and *use of excessive force."* At no point has Anderson alleged that the officers in the present case *intentionally* violated or callously disregarded "appropriate procedures" or that, regardless of procedures utilized, the officers used governmental power "for purposes of oppression." At most, Anderson has alleged that the officers' actions amounted to a lack of due care under the circumstances.[2] However, as the Supreme Court held in *Daniels,* such allegations do not state a cause of action under § 1983.

## II.

The plaintiff in a § 1983 action bears a difficult burden of pleading and proof. His burden may be greater than that required of him in an ordinary tort action. As the United States Supreme Court held in *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982):

> "In *Butz* [*v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)], we admonished that 'insubstantial' suits against high public officials should not be allowed to proceed to trial. 438 U.S. at 507, 98 S.Ct. at 2911. (Citation omit-

---

[1]. The majority erroneously asserts that Anderson alleged in his complaint that the officers used unreasonable force against him. *Ante* at 175. Anderson's complaint is completely devoid of any allegation of "unreasonable force." That allegation in appellant's brief on appeal was not before the trial court, and therefore even if the allegation was sufficient to raise a claim under 42 U.S.C. § 1983, it would not be entitled to any factual consideration on this appeal.

[2]. Though not arguing the issue on appeal in his brief, Anderson did allege in his complaint that the officers intentionally shot him. However, when reading the complaint as a whole, Anderson's allegations of intentional acts are not inconsistent with his negligence theory. It

is readily conceded by all that the officers did intentionally shoot Anderson. Nevertheless, intentional acts do not necessarily equate with an intentional tort. For instance, an individual may intentionally drive in excess of the posted speed limit; yet this does not make his subsequent auto accident an intentional tort. *See Griffith v. Schmidt,* 110 Idaho 235, 715 P.2d 905 (1986) (violation of posted speed limit constitutes negligence *per se* ). Though negligence often arises as the result of heedlessness or inadvertence, "it may also arise where the negligent party has considered the possible consequences carefully, and has exercised his own best judgment." W. Keeton, *Prosser & Keeton on Torts,* § 31 (1984).

ted.) We reiterate this admonition. Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure, and 'firm application of the Federal Rules of Civil Procedure' is fully warranted in such cases. 438 U.S. at 508, 98 S.Ct. at 2911." Several federal courts have held that this additional burden requires the plaintiff to prove the absence of good faith on the officers part or that their actions were unreasonable. *See Smiddy v. Varney,* 665 F.2d 261, 266 (9th Cir.1981) ("Thus, to recover the plaintiff must clear two hurdles: probable cause must be shown not to have existed; the officers must be shown not to have reasonably believed in good faith that probable cause did exist."); *Whitley v. Seibel,* 613 F.2d 682, 685 (7th Cir.1980) ("The burden of proof ... is on the plaintiff to prove the officer's lack of good faith or reasonable cause to believe he was acting unconstitutionally."). *Cf. Zeigler v. Jackson,* 716 F.2d 847 (11th Cir.1983) (once defendant has shown that he was acting within scope of his discretionary authority when allegedly wrongful acts occurred,[3] the burden shifts to plaintiff to show lack of good faith); *Barker v. Norman,* 651 F.2d 1107, 1121 (5th Cir.1981) ("Once the official has shown that he was acting in his official capacity and within the scope of his discretionary authority, the burden shifts to the plaintiff to breach the official's immunity by showing that the official lacked 'good faith.' "). The majority in this case

fails to recognize and then properly analyze Anderson's alleged cause of action under this higher and more difficult burden of pleading and proof.

The only allegations made by Anderson regarding the officers' failure to follow "appropriate procedures," or regarding any abuse of governmental power, center on Anderson's contentions that (1) the officers never identified themselves and (2) that he never aimed his firearm at the officers. However, these allegations cannot withstand close scrutiny even when examined under the summary judgment standard of construing all *permissible* inferences in favor of the non-moving party. Anderson's first contention, that the officers never identified themselves, is meaningless unless it is shown that such identification was required under clearly established state law or federal constitutional law. *Sprague v. City of Burley,* 109 Idaho 656, 710 P.2d 566 (1985). Both Anderson and the majority opinion assume, without citing to any supporting authority, that the officers were required to identify themselves under the facts and circumstances of this case.[4] In the absence of specific allegations that the officers' failure to identify themselves constituted an intentional or callous disregard of "appropriate governmental procedures" and not merely negligent failure to follow any such procedures, Anderson fails to state a cause of action under § 1983.[5] The majority errs in failing to so conclude.

---

**3.** It is important to note that Anderson in his complaint specifically alleged that the acts taken by the officers were within the scope of their employment, *i.e.,* within the scope of their authority. It is also interesting to note that the only evidence in the record concerning whether the officers acted within their authority (*i.e.,* that their actions were in accord with police policy) is the affidavit of Anderson's father, submitted in support of Anderson's opposition to defendants' motion to dismiss. In that affidavit, Anderson's father testifies that he heard the Pocatello Chief of Police state that the officers had acted within department policy.

**4.** Both the majority and special concurring opinions erroneously assert that the officers' failure to identify themselves is somehow relevant to Anderson's § 1983 claim. Both opinions, however, fail to recognize the express

holding of the United States Supreme Court in *Harlow v. Fitzgerald, supra,* that a plaintiff's § 1983 claim cannot withstand a motion for summary judgment unless he clearly asserts that the challenged conduct was "clearly unlawful," *i.e.,* that the conduct was in direct violation of clearly established constitutional or statutory law. Thus, the officers' failure to identify themselves is only relevant *if* they were required by clearly established state statutory law or federal constitutional law to so identify themselves. The majority and special concurring opinions fail to follow the very rule of law they espouse, *ante* at 174.

**5.** In contrast to Anderson's assertions that the officers never identified themselves stands the uncontradicted testimony of the police officer who accompanied Anderson to the hospital after the shooting, Officer Scott. That officer

Anderson's second contention, that he never aimed his firearm at the police officers, is easily disposed of by application of the doctrine of *res judicata,* and in particular the doctrine of collateral estoppel. Factual issues necessarily decided in another action to which Anderson was a party may not be relitigated. In short, factual inferences are not "permissible" inferences for purposes of summary judgment where consideration of such is barred by the doctrine of collateral estoppel. The majority's analysis of the collateral estoppel issue is misleading and, indeed, internally inconsistent. As correctly noted by the majority, Anderson was charged "for aggravated assault upon police officers in violation of Idaho Code § 18–915." *Ante* at 174, Anderson was ultimately found guilty of the lesser included offense of intentionally aiming a firearm at others, I.C. § 18–3304. Anderson defended himself against the charge of assaulting police officers, and the jury's verdict that he intentionally aimed his firearm at "others" is clearly a verdict that Anderson aimed his firearm at the police officers, as they were the only "others" whom he was charged with assaulting. Thus, the inference which Anderson would have this Court draw, and which the majority opinion implicitly draws, *i.e.,* that Anderson did not aim his firearm at the police officers, is an impermissible inference. Anderson is collaterally estopped from asserting that he did not aim his shotgun at the police officers in this civil action. Though properly stating the rule of collateral estoppel, the majority and special concurrence fail to properly apply it under the facts of the present case. The majority's assertion that Anderson's criminal conviction only establishes that he aimed the firearm at "someone" ignores the record. Anderson's own testimony, elicited on direct examination by his attorney at the criminal trial, was nothing short of an admission that he pointed his firearm in the direction of the police officers.

"Q. Is it possible that in the position you were in, now knowing that there was someone on those stairs and by that chimney, [the positions occupied by Officers Black and Gentillon] that the muzzle of that gun may have been pointed in their direction?

"A. It was pointed in that direction."

At no point did Anderson testify, as the majority asserts, *ante* at 180, that "he may have accidentally pointed it at someone at some point." Anderson's own testimony directly contradicts the majority's assertion of aiming only at "someone," and the jury verdict directly contradicts the assertion that the aiming was "accidental." The majority's attempts to recast the facts which were found at Anderson's criminal trial constitutes an unfounded collateral attack on those proceedings.

Anderson also testified that except for his re-entry into his apartment the barrel of his gun was not pointed upward.

"Q. At any time did you raise the stock of the gun to level it or perhaps lowered the barrel?

"A. From this position, the only time that I raised the barrel was to get the barrel under the door jamb in my apartment to walk down the stairs."

Furthermore, the uncontroverted testimony of Anderson at his criminal trial established that he was in a crouched position while holding the firearm and that he aimed the shotgun in a "360 degree radius." The uncontroverted testimony at that trial also indicates that the port-arms position describes a position where Anderson is holding the barrel of the gun with his left hand while his right hand is on the stock of the gun, near to or holding the trigger

---

testified that while at the hospital Anderson asked Scott who shot him. When the officer replied that the matter was under investigation, Anderson promptly responded that he knew that, "It was the cops who shot me." That Anderson possessed such knowledge, even though the officers never identified themselves, is hardly astounding. After all, how many

would-be assailants (which, according to Anderson, is what he thought the people outside his apartment were) order their victims to "Freeze" and to "Drop it"? Anderson's assertion that he never knew the police were involved is belied by Officer Scott's uncontradicted testimony and common sense.

mechanism. Anderson admitted at trial that the shotgun was in firing position when he exited his apartment.

Another important fact adduced at the criminal trial is that the events in question in this case took place in an extremely brief period of time. The uncontradicted and uncontroverted testimony of Officers Black and Gentillon is that anywhere from 5 to 15 seconds elapsed from the time Anderson first exited his apartment until the first shots were fired. Even testimony elicited from Officer Gentillon by Anderson's attorney during cross examination regarding the possibility that Anderson was turning away from the officers at the time the shots were fired indicates that the time differential between the firing of the shots and Anderson's possible movement back toward his apartment constituted fractions of a second.

"Q. So you actually fired before—he was still spinning at the time you fired or turning?

"A. That may have been possible. He was already in a position to where he could have fired the weapon at us. It's so fast there, and you can't say where one person is going to fire and another person is going to fire. It might be just split—I mean thousandths of seconds difference, which is almost nothing."

This testimony was uncontroverted at the criminal trial and remains uncontroverted by the allegations found in Anderson's affidavit. The majority's assertion that the criminal action did not necessarily decide "that Anderson was pointing the shotgun at anyone at the time he was shot," *ante* at 180, is entirely unwarranted. In short, the district court in the present case correctly concluded that "under the total circumstances and the brief [time] in which all relevant events took place, as the officers were faced with a shotgun reasonably known to them to be loaded and in firing position; and with that gun turning toward them in a port arms or lower position after they ordered otherwise, their actions ... cannot be said to be unreasonable." (Emphasis added.)

The only other inference which the majority deems as permissible and which allegedly supports Anderson's assertion that the officers' actions were unreasonable is that Anderson allegedly was shot in the back. However, the majority misstates the facts established in the record. There is no support for the assertion that Anderson was shot in the "back." Anderson's own testimony at the criminal trial belies any contention that he was shot in the back.

"Q. Could you stand up, Mike, and point to the places where you were hit by the bullets?

"A. I was hit right here. This bullet went straight across, put three nicks in my small intestine, stopped on this side. *I was hit right here in the hip.*

"Q. Okay. Which one hit you first?

"A. I don't recall which one hit me first. I just felt two sharp pains *in my side.*"

Both gunshot wounds were inflicted on Anderson's left side. The wounds are entirely consistent with the facts established at the criminal trial. The uncontroverted facts established at that trial by Anderson's own testimony are as follows. Anderson exited the stairwell to his apartment and when standing on the top landing to the stairwell he was facing north. With the shotgun at port-arms position (barrel held in Anderson's left hand) Anderson's body was at all times roughly parallel to the gun barrel. In other words, the end of the barrel and the left side of Anderson's body would always face the same direction. (Anderson's own testimony was that the gun never left the port-arms position except when reentering his *apartment.*) Once on the top landing, Anderson saw someone to his left (or west). That person was Mark Romriell.

"Q. ... When you came out of the top of the stairs, you saw someone to your left?

"A. Yes.

"Q. Were you able to determine who that was?

"A. No.

"Q. All right. You now know based on testimony who it was?

"A. Yes. It was Mark Romriell."

Anderson then heard, off to the right (or east) the command from Officer Black to "freeze" and he turned partially in that direction.

"Q. Okay. What happened next that you recall?

"A. I heard "Freeze" off to the right, and I turned to the right.

. . . .

"A. Okay. I turned to the north like this looking at the tree. Okay. I was looking at the tree.

"Q. Why did you look at the tree?

"A. Because that's where I thought the 'Freeze' come from was the tree."

After hearing the command to "freeze," Anderson then, according to his testimony, started to turn back towards the stairwell (or south). It was at this point that the gun pointed at the positions of Officers Black and Gentillon.

"Q. All right. Did you hear anything after that [command to 'freeze']?

"A. No, I did not. I just—turned. I turned back around and headed back to the doorway. When I got about here, I heard a 'Hold it.'

"Q. Now, about there, how far from the entryway to your apartment, *the stairway*?

"A. I think this is about five feet. So I might have gone about another two feet back, taking one step when I heard—

"Q. Okay. So you're probably still three feet from the doorway?

"A. I think it was probably closer to two feet from the doorway.

. . . .

"Q. Where were you when you got shot?

"A. I think I was about two feet from the door when I got shot.

"Q. Okay. What direction were you facing when you got shot?

"A. South.

"Q. Towards your—*the door to the stairway*?

"A. That's correct." (Emphasis added.)

Thus, with the firearm in the port-arms position and pointed at Officers Black and Gentillon, Anderson's left side would have also been facing the officer, *i.e.*, in the line of fire. (As indicated earlier, Anderson admitted that he pointed his shotgun at the sites where Officers Black and Gentillon were located, which was to the east of the top of the stairway. The only time this would have been possible with the gun in port-arms position was when Anderson was facing south, *i.e.*, when he was facing the stairway.) Gentillon then ordered Anderson to "Drop it." Seconds after this order, both officers, who were positioned nearly one behind the other, fired simultaneously. Anderson's own testimony comports with the fact that he was shot in the left side. When the shots were fired he was turning to face south. (The uncontradicted testimony of Officer Gentillon, discussed earlier, was that the elapsed time from firing to Anderson's turning back toward the stairwell was fractions of a second.) At that point the barrel of the shotgun, in port-arms position, would have been facing east or to his left, placing his left side directly in the line of fire from Officers Black and Gentillon. Anderson's own testimony was that he was two to three feet from the doorway to the stairwell when the shots were fired.

In short, the facts, as established at the criminal trial by Anderson's own testimony, clearly indicate that as Anderson was turning back toward the stairway leading to his apartment he was aiming his firearm at the officers. The jury verdict held that this aiming was *not accidental,* as asserted by the majority, but that *it was intentional.* The facts, as established at the criminal trial (indeed by Anderson's own testimony), clearly indicate that Anderson's aiming at the officers had *not* ceased when the shots were fired. There can be no conclusion except that appellant Anderson intentionally aimed the shotgun at the officers, and that therefore the officers' actions were reasonable.

The burden was on Anderson to prove that the officers' conduct was not reasonable or not taken in good faith. Anderson

has failed in this burden. The factual allegations which he asserts in support of his claim are both legally insufficient and barred by the doctrine of collateral estoppel.[6] The majority errs in its less than careful analysis of the facts on the record before us, and in its failure to properly analyze the two most recent decisions of the United States Supreme Court. The district court's summary judgment should be affirmed.

SHEPARD, C.J., concurs.

---

6. The special concurrence ignores the effect that collateral estoppel has upon the allegations found in Anderson's affidavit. As the above discussion indicates, the facts established at the criminal trial *by Anderson's own testimony* are directly contrary to the allegations contained in his affidavit. The conflict between Anderson's affidavit and his sworn testimony at criminal trial underscore the very need for application of the doctrine of collateral estoppel. The special concurrence would have us ignore Anderson's own testimony at his criminal trial and the jury's finding that he intentionally aimed his firearm at the officers.